Berth C. and Louise P. NESS,
Respondents,

v.

COMMISSIONER OF TAXATION,
Relator.

No. 47969.

Supreme Court of Minnesota.

May 26, 1978.

Rehearing Denied July 5, 1978.

Warren Spannaus, Atty. Gen., C. H. Luther, Deputy Atty. Gen., Dept. of Revenue, St. Paul, for relator.

William R. Busch, St. Paul, for respondents.

YETKA, Justice.

Certiorari to the Tax Court of Appeals on petition by the commissioner of taxation pursuant to Rule 115, Rules of Civil Appellate Procedure. Relator seeks review of the tax court decision affording respondents certain deductions from their Minnesota gross income for the years 1964 through 1970. We reverse.

For all the years in question, respondents were Minnesota residents who timely filed joint, cash-basis returns allocating all their income and deductions to Minnesota. Only the income and deductions of respondent Berth C. Ness are disputed.

Mr. Ness owned and operated the Ness Financing Company as well as other corporations engaged in the road construction and automobile sales businesses. These businesses were all located in Minnesota. In 1958 and 1959, he purchased approximately 4½ sections of land in Arizona from the State of Arizona. The price was about 1 million dollars with both principal and interest payments being spread over 37 years. In each of the tax years 1964 to 1968, Ness paid the Ness Financing Company the amount of the payment to the State of Arizona and the finance company then paid the state. The land was disposed of in 1969.

In 1960, Ness became acquainted with W. W. Creighton, who was associated with a land development project near Ness' Arizona land. Creighton represented himself as a wealthy and successful developer and gained Ness' complete confidence. Between 1960 and 1964, Creighton convinced Ness to invest large sums of money in various Arizona developments. It was not until 1969 that Ness discovered that Creighton had misrepresented his personal financial condition, failed to disclose his status as a commission agent in certain transactions, and misrepresented the extent of his investment in enterprises in which he and Ness joined. The losses allegedly caused by Creighton's fraudulent activity are the subject of this case.

In 1962 Creighton convinced Ness to trade one of his sections of land for a shopping center known as "Apache Junction." In connection with this transaction, Ness and Creighton formed the Ness Investment Company, an Arizona corporation. Ness transferred his section of land to the investment company in exchange for 55 percent of its stock and $120,000 of the proceeds of the sale of the land. Creighton was supposed to transfer $80,000 for the remainder of the stock, but in fact never paid that amount. The investment company then traded the section for the shopping center site plus $120,000 from the proceeds of the sale of the property. In 1963, the investment company purchased the Superstition Ho Hotel, located near the shopping center. Unknown to Ness, Creighton received commissions totalling about $200,000 from the sellers of the shopping center and hotel.

Ness Investment Company began developing the Apache Junction site in 1963. The development was financed by various

financial institutions which required Ness and Creighton to personally sign the notes. Creighton handled most of the operation of Ness Investment Company until 1964 when Ness became dissatisfied with his management and purchased his interest. Ness continued to consult Creighton with regard to the affairs of the company and, until Creighton's death in 1966, advanced him considerable sums of money, either directly through the Ness Investment Company, or by cosigning and paying notes for loans taken out by Creighton. Ness also made substantial loans to the Ness Investment Company.

In each year 1964 through 1970, Ness deducted from his Minnesota income the operating losses of the Ness Investment Company, interest paid on loans used in connection with the investment company and Arizona real estate, and other expenses incurred in connection with the Arizona business and property. The commissioner of taxation, by order dated October 15, 1971, disallowed certain deductions for the years 1964 through 1967 and assessed additional taxes totalling $65,735.21. By order of August 4, 1972, additional taxes for years 1968 through 1970 totalling $38,521.56 were assessed.

All disallowances were based on Minn.St. 1969, §§ 290.17 and 290.18, which provided that income from property and businesses located wholly outside Minnesota shall be allocated to other states and that deductions for trade or business expenses shall be allowed only to the extent they are connected to the production or receipt of gross income that is assignable to Minnesota. The commissioner of taxation reasoned that since the deductions were connected with land and business located wholly in Arizona, they were not allowable in this state. Ness appealed both assessment orders. The Tax Court found, generally, that the deductions "were the direct result and consequence of the fraudulent acts, devices and schemes of this land promoter and constituted theft losses under Minn.St. 290.09, subd. 5(a) and (c) properly deductible as such for Minnesota income tax purposes * * *." The Tax Court also found that the Ness Invest-

ment Company (which operated the shopping center and hotel in Arizona) "constituted a personal service business for Minnesota income tax purposes." The Tax Court further held that the "theft losses" arose out of Ness' Minnesota finance company business and were therefore allocable to Minnesota. Alternatively, it stated that since Ness assigned and reported all his taxable gross income to Minnesota, the "theft losses" were deductible under Minn.St. 290.18, subd. 1(2), since Ness was not engaged in any nonpersonal service business outside the state.

The Tax Court concluded that the assessment order of October 15, 1971, was invalid with respect to the years 1964 and 1965 because it was issued after the expiration of the applicable statute of limitations. It further concluded that, by reason of the deductions allowed, Ness suffered net losses for the years 1965 through 1968 and that loss carrybacks and carryovers reduced his 1964 and 1969 net income to zero and his 1970 income to $17,659.39. Of the total $104,256.77 assessed, the tax court allowed $1,485.03 as properly assessable against Ness for 1970.

The commissioner of taxation raises these issues on appeal:

1. Whether interest expense incurred by a Minnesota resident in the purchase of Arizona real estate is allowable as a deduction from Minnesota income for the years 1964 through 1970.

2. Whether operating losses and other expenses incurred by a Minnesota resident in connection with the operation of a hotel and shopping center located in Arizona are allowable as deductions from Minnesota income for the years 1964 through 1970.

3. Whether an assessment order issued on October 15, 1971, is barred by the statute of limitations insofar as it applies to the years 1964 and 1965, where the taxpayer consented to extensions of the Federal assessment period for those years in January 1968, January 1969, and February 1970, and did not notify the commissioner of taxation of those extensions until March 5, 1971.

■ (1) "Theft": The Tax Court's finding that the disputed deductions constituted "theft losses" is without support in the record. It may be true that W. W. Creighton defrauded Ness. Nevertheless, none of the disputed deductions is related to any fraudulent activity. The fraudulent acts alleged were (a) misrepresentation of personal worth; (b) failure to disclose commissions earned on sales of property to Ness Investment Company; (c) failure to pay $80,000 for a 45 percent share of Ness Investment Company; and (d) overstating the book value of his 45 percent share when he sold it to Ness in 1964.

For 6 of the 7 years in question, Creighton had no ownership or management position in Ness Investment. Ness was the sole owner. The only possible relation between Creighton's fraudulent activities and the corporation's operating losses was that Creighton had originally convinced Ness to form the corporation and develop Apache Junction. After 1964, there was no one in the corporation besides Ness to commit "theft." Ness had become obligated to make the interest payments on the 4½ sections of land in 1959, before he had even met Creighton. Thus there is no possible connection between Creighton's fraud and these payments. In summary, the disputed deductions were either personal or business expenses, not "theft losses."

(2) Deductibility: Minn.St.1969, § 290.18, subd. 1, provided in part:

"The taxable net income shall, except insofar as section 290.19 is applicable, be computed by deducting from the gross income assignable to this state under section 290.17 deductions of the kind permitted by section 290.09 in accordance with the following provisions:

"(1) Such deductions shall be allowed to the extent that they are connected with and allocable against the production or receipt of such gross income assignable to this state; * * *."

Under § 290.18, deductions of the kind permitted by Minn.St.1969, § 290.09 (including interest paid and business losses) are allowed only if they are connected with an activity the income of which is assignable to this state. Thus, the deductibility of the disputed items depends on whether the gross income of the activities that gave rise to the expenses was assignable to Minnesota under Minn.St.1969, § 290.17.

Minn.St.1969, § 290.17, provided:

"Items of gross income shall be assigned to this state or other states or countries in accordance with the following principles:

"(1) The entire income of all resident or domestic taxpayers from compensation for labor or personal services, or from a business consisting principally of the performance of personal or professional services, shall be assigned to this state. * * *

"(2) * * * Income and gains received from tangible property not employed in the business of the recipient of such income or gains, and from tangible property employed in the business of such recipient if such business consists principally of the holding of such property and the collection of the income and gains therefrom, shall be assigned to this state if such property has a situs within it, and to other states only if it has no situs in this state. * * *

"(3) Income derived from carrying on a trade or business, including in the case of a business owned by natural persons the income imputable to the owner for his services and the use of his property therein, shall be assigned to this state if the trade or business is conducted wholly within this state, and to other states if conducted wholly without this state. This provision shall not apply to business income subject to the provisions of clause (1); * * *."

(a) Interest on Arizona Real Estate Purchases:

■ Under § 290.17(2), income from tangible property not employed in the taxpayer's business is assignable to Minnesota only if the property has a situs in this state. The situs of the Arizona real estate, which Ness purchased for investment, is clearly not in Minnesota. Ness owned the Arizona

land personally; there is no evidence that the land was employed in any Minnesota business. Thus, gains and income from the land are not assignable to this state. Since income from the property would not be assignable to Minnesota, deductions permitted by § 290.09 that are connected to the property are not allowed against Minnesota gross income.

*In re Estate of Abbott*, 213 Minn. 289, 6 N.W.2d 466 (1942), held that a taxpayer's expenses in securing rights to out-of-state land and exploring it for gold were not deductible from his Minnesota income. The court noted that profits from the sale or other use of the property—

"* * * would have been received from tangible property outside the state and would have been properly taxable at the situs of the property. And expenses in connection with such property would be deductible in the tax returns to the state of the property's situs. The necessary conclusion is that profits could have been realized from tangible property outside of Minnesota, which profits would be taxable by such other state, and not by Minnesota; and that any expenses in connection with such property would be deductible in such other state, not in Minnesota." 213 Minn. 295, 6 N.W.2d 469.

(b) Operating Losses of Ness Investment Company:

Section 290.17(3) provided that income from carrying on a trade or business "shall be assigned * * * to other states if [the trade or business is] conducted wholly without this state," except that under § 290.-17(1) income "from a business consisting principally of the performance of personal or professional services * * * shall be assigned to this state."

There is no evidence that the Ness Investment Company conducted any business in Minnesota. Its business consisted of the ownership and operation of the Apache Junction shopping center and the Superstition Ho Hotel, both located in Arizona. Thus, unless the business of the Ness Investment Company can be characterized as "consisting principally of the performance of personal or professional services," income from the business would not be assignable to this state and expenses incurred in connection with the business could not be deducted from Ness' Minnesota income.

The tax court found that the Ness Investment Company "constituted a personal service business for Minnesota income tax purposes." It apparently reached this conclusion because "[t]hroughout the years here in issue, appellant B. C. Ness devoted 80 to 90% of his time during the non-road construction season (October to April) of each year to the personal supervision and management of the affairs and operations of this venture enterprise." The tax court misinterpreted the statute.

In *Bechert v. Commissioner of Taxation*, 221 Minn. 65, 21 N.W.2d 101 (1945), we held that a resident taxpayer's entire share of the profits of a national accounting partnership were assignable to Minnesota even though a large portion of partnership income was produced in other states. We stated: "* * * An accounting business, a law firm, a medical or dental clinic, or an architectural or engineering firm all falls clearly within the group of businesses which are engaged in the rendering of personal or professional services." 221 Minn. 68, 21 N.W.2d 103.

In *Bolier v. Commissioner of Taxation*, 233 Minn. 72, 79, 45 N.W.2d 802, 806 (1951), which held that a road construction business did not consist of the performance of personal or professional services, we noted: "* * * The determinative question under § 290.17(1) is whether the particular business was engaged primarily in business activities which are generally recognized and accepted as rendering services of a personal or professional character."

The latest case dealing with this issue is *Charles W. Sexton Co. v. Hatfield*, 263 Minn. 187, 116 N.W.2d 574 (1962), where we held that an incorporated insurance agency was not a business principally performing personal or professional services. Conceding that an individual insurance agent may perform personal services, we found that the corporation did not, and stated:

"It seems to us that the personal service concept as used in our statute must apply to income derived from personal activities of those who share in the income. Where the personal service is rendered wholly by employees, or only by those who are slightly interested in the corporation, it does not seem to us that the personal service concept is appropriate. If, as in the Bechert case and the recent Wisconsin case of *Whitney v. Wisconsin Dept. of Taxation,* 16 Wis.2d 274, 114 N.W.2d 445, the income was received primarily from the activities of the individual taxpayer, we could agree that the concept would apply. In the case before us, however, it cannot be said that those who derive income from the operation of the business are devoting their time and energies or activities in a substantial measure so as to characterize the income as being derived from a personal service. From the record it appears that the taxpayer corporation is obviously an impersonal corporate entity and not one in which the stockholders and directors are directly engaged in the activities which produce the income of the corporation." 263 Minn. 197, 116 N.W.2d 581.

■ From the above decisions, two conditions must be met before a taxpayer's income can be deemed personal-or-professional-service income. First, the income-producing activity itself must be the rendition of personal or professional services; and, second, the taxpayer must personally render such services; it is not enough to employ others to render them.

Ness' Arizona business enterprise satisfied neither of the above conditions. First, the income producing activities were the ownership and management of a shopping center and a hotel. These activities are primarily the furnishing of building space, not of personal service. Second, there is no indication that Ness performed any personal services himself. As was the case with the directors and shareholders in *Charles W. Sexton Co. v. Hatfield, supra,* Ness was engaged in running the corporation, not in directly producing income.

■ Because the Ness Investment Company was not a business consisting primarily in the performance of personal or professional services, and because its business was conducted wholly outside Minnesota, income from the business was not assignable to Minnesota. Therefore, losses and expenses incurred in connection with the business were not deductible from B. C. Ness' Minnesota income.

(3) Statute of Limitations: Ness' Minnesota tax returns for the years 1964 and 1965 were filed on or before April 15 of 1965 and 1966 respectively. Minn.St. 290.49, subd. 1, provides that all assessments shall, unless otherwise provided, be made within 3½ years of the filing of the return. Thus, unless the assessment period was extended, it expired on October 15, 1968 for the 1964 return and on October 15, 1969 for the 1965 return. Respondents contend, and the Tax Court held, that the assessment order of October 15, 1971, was entered and mailed after the expiration of the limitations period and was therefore void. The commissioner contends that the statutory period was extended by operation of Minn.St.1967, § 290.56, and Minn.St. 290.56, subd. 5, and that the order of October 15, 1971 was therefore timely.

Minn.St.1967, § 290.56, provided, in part, as follows:

"(B) If the amount of net income for any year of any taxpayer as returned to the United States Treasury Department is changed or corrected by the commissioner of internal revenue or other office of the United States or other competent authority, or where a renegotiation of a contract or subcontract with the United States results in a change in net income, such taxpayer shall report such changed or corrected income, or the results of such renegotiation, within 90 days after the final determination of such change or correction or renegotiation, or as required by the commissioner of taxation and shall concede the accuracy of such determination or state wherein it is erroneous. Any taxpayer filing an amended return with such department shall also file with-

in 90 days thereafter a copy of such amended return with the commissioner of taxation. Any taxpayer who consents to an extension of time for the assessment of taxes with the internal revenue service shall within 90 days notify the commissioner of taxation of the execution of such consent.

"(C) Failure to report such changed or corrected federal net income or to file a copy of such amended federal return or notify the commissioner of the execution of such consent as set forth above and within the time stated shall suspend the running of the period of limitation until such report or copy has been furnished to the commissioner of taxation, or until such six months following the expiration of the federal period of limitation where no change is made or amended return is filed."

Ness consented to extensions of the assessment period with respect to his 1964 and 1965 Federal tax returns in January 1968, January 1969, and February 1970. No notice of such consent was given to the commissioner of taxation. Thus, under Minn.St.1967, § 290.56, the 3½-year limitation period of Minn.St. 290.49, subd. 1, was suspended in April 1968, at the end of the 90 day notification period. At the time of the suspension, approximately 6 months remained of the assessment period for the 1964 return.

In June 1969, L.1969, c. 1042, § 1 (Minn.St. 290.56), modified the effect of consents to extension of the Federal assessment period in pertinent part as follows:

"Subd. 5. Any taxpayer who consents to any extension of time for the assessment of federal income taxes shall within 90 days of the execution of such consent notify the commissioner and *the period of time in which the commissioner may recompute the tax is also extended* notwithstanding any period of limitations to the contrary as follows:

"(a) For the periods provided in subdivisions 3 and 4 * * *." (Italics supplied.)

Subdivisions 3 and 4 of § 290.56 provide extensions of the assessment period for 6 years where the taxpayer fails to notify the commissioner of changes in or amendments to his Federal return, and 1 year from the filing of the report where the taxpayer does not fail to notify the commissioner of such changes or amendments. Section 290.56, as amended by L.1969, c. 1042, § 1, applied "only to final federal changes and corrections made, amended returns filed, or extensions of time agreed upon" (L.1969, c. 1042, § 2) after its effective date, June 7, 1969.

On March 5, 1971, Ness filed with the commissioner of taxation reports of the final result of the recomputation of his 1964 and 1965 Federal returns. Since this filing would have been sufficient to end the suspension of the limitations period under Minn.St.1967, § 290.56, the 3½-year assessment period would, under that provision, have expired in September 1971. The commissioner's order of assessment was not mailed until October 15, 1971, and thus would not have been timely under that provision with respect to Ness' 1964 return. It would have been timely with respect to the 1965 return since, when the running of the limitations period was suspended, approximately 1½ years of the period remained.

■ The 1969 amendment, however, did not provide that the running of the assessment period was merely suspended. Rather, it extended that period for, in this case, 1 year after Ness filed the report of changes in his Federal return with the commissioner. Thus, under § 290.56, subd. 5, the commissioner had until March 5, 1972 to make additional assessments against Ness' 1964 return. Section 290.56, subd. 5, clearly applies to this case because Ness consented to an extension of the Federal assessment period with respect to his 1964 return in February 1970, which was after the effective date of the amendment.

■ The taxpayer argues that Minn.St. 1967, § 290.56, left a loophole by failing to cover the situation where a taxpayer fails to notify the commissioner of his consent to extension of the Federal assessment period

and a change is made in his Federal return. The statute refers to failure to "report" changed Federal income, to "file a copy" of amended returns, and to "notify" the commissioner of the execution of a consent to extension. It states that such failures "shall suspend the running of the period of limitation *until such report or copy has been furnished* to the commissioner." (Italics supplied.) This language clearly states where the taxpayer fails to notify the commissioner of the execution of consent to extension of time and a change in Federal income is made or an amended return filed the running of the statute is suspended until a report of changed Federal income or a copy of an amended return is furnished to the commissioner. Thus, the taxpayer's contention that the statute did not cover the situation of this case must fail.

The tax court is reversed and the case remanded for the purpose of determining the tax and interest due.