690 P.2d 764
**STATE of Arizona, Appellee,**

v.

**Glenn Ray LAMB, Appellant.**

**No. 6018.**

Supreme Court of Arizona,
In Banc.

Oct. 25, 1984.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Barbara A. Jarrett, Asst. Attys. Gen., Phoenix, for appellee.

George F. Klink, Phoenix, for appellant.

CAMERON, Justice.

The defendant, Glenn Ray Lamb, was convicted of two counts of first degree murder, A.R.S. § 13–1105, and one count of armed robbery, A.R.S. § 13–1904. He was sentenced to twenty-one years for the robbery, A.R.S. § 13–702, and to two terms of life imprisonment without possibility of parole for twenty-five years for the murder convictions, A.R.S. § 13–703. The murder sentences were made consecutive to the robbery sentence but concurrent to each other. We have jurisdiction pursuant to Ariz.Const.Art. 6, § 5(3) and A.R.S. § 13–4031.

The issues we must resolve are:

1. Was the defendant arrested without probable cause?
2. Was it reversible error to fail to disclose to the grand jury the reasons for the public defender's withdrawal?
3. Did the trial court err in refusing to allow evidence as to why the public defender withdrew from the case?
4. Was testimony of one witness about "other" murders so prejudicial it deprived the defendant of a fair trial?
5. Was improper testimony admitted at trial?
6. Was the defendant entitled to forms of verdict for both premeditated murder and felony murder?
7. Did the court err in not instructing on lesser-included offenses?
8. Did the court err in not giving a "Willits" instruction about lost or destroyed evidence and in neither sup-

pressing the evidence nor granting the defendant's motion to dismiss?

9. Was an improper sentence imposed in count III (the robbery conviction)?

The facts follow. On 18 September 1979 the victims, Roberta Mae Durr and Russell Wilson, operated the K & L Bar in downtown Phoenix. They closed the bar between 7:00 and 8:00 p.m. and, as they often did, went with their friend, Harold Starr, to the nearby Silver Dollar Bar where the defendant was the bartender. As was their custom, the victims took the cash from the register at the K & L Bar, purported to be over $400, with them. After a while, Starr left for the victims' apartment. The victims intended to follow after him. Three electricians were also in the bar when the trio arrived, and they were still there when Starr left. It is unclear from the testimony whether the victims or the electricians left the Silver Dollar first. It is also unclear exactly what time the electricians left. They had all left, however, when, sometime between 10:30 and 11:30, two policemen drove down the alley behind the Silver Dollar and saw the defendant mopping the area inside the back door of the bar. The officers testified Durr's light blue Thunderbird was in the alley. Around 2:00 a.m. on the 19th, Starr, who had been sleeping at the victims' apartment, noticed the victims were not yet home. He drove to the K & L looking for them but they were not there. He drove past the Silver Dollar, but the bar was closed and the lights were out. About 3:30 Lawrence Prince arrived for work at his produce company, situated behind the Silver Dollar. He saw a man lying beside a car in the alley and called the police. The police drove through the area but did not stop. Prince called again, and when the police arrived the second time Prince stopped them in the alley and told them what he had seen. The officers discovered Wilson next to the Thunderbird in a pool of blood, badly beaten but still alive. Paramedics arrived shortly thereafter, but Wilson died before regaining consciousness. While one of the paramedics was looking for something with which to prop up Wilson's head,

he found Durr's body in a dumpster next to the rear door of the Silver Dollar. She had been beaten with a blunt instrument, put in the dumpster, and covered with a plastic sheet. Durr's keys were found in the ignition of her car and her empty purse was on the front seat.

The defendant was interviewed between 6:00 and 7:00 the morning of the 19th. He claimed the victims left the bar shortly after Starr. At approximately 9:20 that morning, the defendant registered for a room at the Hyatt Regency Hotel under the name of Glenn Neff. He paid the $42 fee for one night and also rented a safe deposit box from the hotel. Shortly thereafter, the defendant gave the key to the box to his employer, Jerry Ornatek, and asked him to hold it for him.

Later that morning, the police discovered blood spots in the area near the rear entrance of the Silver Dollar. There were droplets on the inside of the door, on the inside wall, on the door frame, around the baseboard, and around the restroom door. The wooden bar used to secure the door had blood on it, and there was what one witness testified looked like blood mixed with water underneath a booth near the rear entrance. After this discovery, the police again interviewed the defendant. After this second interview, the defendant was arrested.

Ornatek turned the defendant's keys over to the police. In December they located the safe deposit box and found $333 in it. On 29 January 1980 the public defender assigned to represent the defendant withdrew because of a conflict of interest. On 13 June 1980 the charges against the defendant were dropped without prejudice.

In September of 1982, three years after the victims' deaths, the defendant was staying in Texas with his brother and sister-in-law, Roger and Bettye Lamb. Bettye and a friend, John Osborne, both testified that the defendant claimed you could get away with murder in Phoenix if you knew the right people. Bettye testified she did not take his comments seriously at

first, but after he repeated them several times and stole $20,000 from her, she decided he was telling the truth and had been involved in the Phoenix murders. She further testified the defendant stated he was not worried about returning to Phoenix because he had "gotten away with murder there." The defendant was again arrested and tried and convicted, and now appeals.

## I. Was there probable cause to arrest

The defendant claims his 1979 arrest was illegal because it was not based on probable cause, and "therefore all evidence subsequently seized or acquired was the fruit of that illegality." He insists his arrest was based on no more than a hunch or mere suspicion. He claims at the time of his arrest the police knew other people had threatened the victims' lives, that there was no evidence connecting him to the crimes, that there was at the time no evidence connecting him with any money, that there was no evidence of exactly where Durr was killed, and that there was no reason to suspect that he committed the murders or the robbery. We do not agree.

■ Probable cause has been defined as follows:

[P]robable cause for an arrest without a warrant, is reasonable ground of probability supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused guilty. 'Probable cause' or 'reason to believe,' therefore, is like a third quarter percentile: it is more information than would justify the officer in saying, 'From all the circumstances I suspect this man'; but it need not be such information as would justify the officer in saying, 'From all the circumstances, I know this is the man'.

*Monroe v. Pape*, 221 F.Supp. 635, 642–43 (N.D.Illinois 1963). The two bludgeoned bodies, of course, indicated that a public offense had been committed. The question is whether the police had probable cause to believe the defendant had committed the crimes. In answering this question, we consider only the facts the police knew at the time of the arrest. The victims had been in the Silver Dollar Bar the previous evening, and their bodies were found at the rear of the bar near the back door. The defendant was the bartender at the bar. Between 10:30 and 11:30 p.m. the defendant had been observed mopping the area inside the back door of the bar. The police found fresh blood inside the bar, on the two by four the defendant used to prop the back door of the bar open, on the two by six the defendant used to close the back door, and on the inside of the door frame. As Officer Harry Jennings of the Phoenix Police Department testified:

It appeared, like I said, that there was blood spattering inside the door frame and on one end of a two-by-four which was used to keep the door open, and after I talked to him and he stated that he was the last one in the bar and that the victims were the last customers in the bar, and due to the fact it appeared that the one victim had been bludgeoned at the back door with the back door open, it was assumable that he would have been the suspect.

The physical evidence, together with defendant's incriminating statements to the police, raised a reasonable inference that it was the defendant who had murdered the two victims. We find the police had probable cause to arrest the defendant at the time they arrested him. We find no error.

## II. Irregularities in the Grand Jury proceedings

The defendant next argues "Refusal to disclose [to the Grand Jury] the fact of the Public Defender's prior representation and the reasons for his removal from the case constitute[d] prosecutorial misconduct and a denial of [the defendant's] right to a fair trial and impartial presentation of the evidence." Defendant cites *Crimmins v. Superior Court*, 137 Ariz. 39, 668 P.2d 882 (1983) in support of his claim, and insists that, by withholding evidence, the prosecutor controlled the result of the grand jury proceeding. We need not reach this ques-

**468**

tion, however, because *Crimmins,* supra, does not apply to this case.

■ In *Crimmins,* the appellant brought a petition for special action prior to his trial challenging the grand jury proceedings. In the instant case, the defendant did not challenge the determination of probable cause until the instant appeal. He waived his right to challenge the determination of probable cause by failing to act in a timely manner. Rule 12.9, Arizona Rules of Criminal Procedure, 17 A.R.S. As we have stated:

> Pursuant to 17 A.R.S., Rules of Criminal Procedure, rule 12.9.a, a grand jury proceeding may be challenged only by a motion for a new finding of probable cause. Subsection b. of the same rule states that such a motion may be filed no later than· twenty-five days after the transcript and minutes of the grand jury proceeding have been filed. A defendant waives his objections to the grand jury proceeding by failing to comply with the timeliness requirement.

*State v. Smith,* 123 Ariz. 243, 247–48, 599 P.2d 199, 203–04 (1979) (citation omitted). We find no error.

III. Testimony of the public defender

The public defender initially assigned to represent the defendant, Michael Edwards, withdrew from the case in January, 1980. His motion stated:

> Within the last week counsel has become aware of the following: certain information of an exculpatory nature as to the defendant Lamb is in the hands of the Public Defender's Office. The problem arises because this information which was gained solely through representation of another client, tends to be inculpatory as to the "other client" through whose representation the infor-· mation was obtained.

The defendant, at the hearing on his motion to compel discovery, attempted to learn the factual circumstances behind that motion. Edwards testified the other client communicated information to another attorney in the office, and Edwards learned of the information while working in the office. He would not reveal the name of the other client but did admit his source was twofold, he had seen a police report and he had spoken with an investigator in the Public Defender's Office about the client. The defendant asked whether a specific police report of an assault (with a baseball bat) by a Mr. J. was the report in question, but Edwards claimed the attorney-client privilege. The trial court took the matter under advisement and later ruled the communication and identity of the other defendant were privileged, stating:

> IT IS ORDERED sustaining claims of privilege as to unknown defendant's identity;
> FURTHER ORDERED sustaining claim of privilege to all questions which would tend to reveal identity of said unknown defendant.

■ Later at trial the defendant attempted to introduce Edwards' motion to withdraw, but the trial court sustained the prosecution's objection to admission of the motion. The trial judge indicated he did not allow the introduction of the motion to withdraw because he thought it involved mere conclusions of the witness. The defendant claims the motion should have been admitted and Edwards should have been ordered to testify as to the facts surrounding his withdrawal. We believe the trial court was correct for two reasons.

■ First, the information about the conflict in interest came from a communication within the public defender's office with the other client, and this communication was privileged. The police report, though not in itself privileged, if admitted, would reveal the name of the Public Defender's Office's client. We had reason to consider a similar question:

> At trial, it was alleged that another individual had confessed to the crime for which Macumber was being tried. This confession had been made to two attorneys who were willing to testify at the trial of the appellant, the person said to have confessed having died. The court

refused the evidence finding, *sua sponte*, that it was privileged.

ARS § 13–1802 provides that an attorney shall not be examined as to any communication made to him by his client without the consent of his client. The privilege is that of the client and only he or someone authorized by law to do so on his behalf may claim it. * * * However, in the absence of the privileged individual, the privilege may be asserted by another including the trial court itself. * *

The privilege does not terminate with death. * * * It has been commonly suspended only in cases where the communication would be logically thought to further the interests of the deceased such as a will, * * * or where a person normally able by statute to invoke the privilege for another does so to exclude evidence in a prosecution for a crime against that person.

The attorney-client privilege is statutory and an attorney is not allowed to waive the privilege under the circumstances of this case. The legislature has presumably weighed the possibility of hampering justice in originally providing for the privilege.

*State v. Macumber*, 112 Ariz. 569, 571, 544 P.2d 1084, 1086 (1976) (citations omitted). Defendant claims, however, that at least he should be able to know the name of the client. Generally, the name of a client is not privileged. *Dunipace v. Martin*, 73 Ariz. 415, 242 P.2d 543 (1952); *State v. Alexander*, 108 Ariz. 556, 503 P.2d 777 (1972). In the instant case, however, the attorney, in order to properly give the court sufficient facts upon which it could rule on the motion, said more than he would normally have said. He need not be required to say more.

Second, the motion was based on mere conclusions. The motion to withdraw included the unsupported claim the attorney had learned evidence "exculpatory [in] nature as to defendant Lamb * * * [but] inculpatory as to [another] client." Edwards gave very few supporting facts concerning

this broad allegation, and the motion to withdraw itself, without background information, was unreliable and prejudicial. We find no error.

IV. Prejudicial testimony

During direct examination of Bettye Lamb the following occurred:

Q [by Mr. Windtberg, the prosecutor]: During that time did the subject of the murders in Phoenix come up?

A [Bettye Lamb]: Yes.

Q Did you hear the defendant make any statements about those murders?

A I said yes, but I don't know if it was the murders in Phoenix or the other murders.

MR. KLINK [defendant's attorney]: Your Honor, may we approach the bench?

THE COURT: Yes.

(Whereupon, the following proceedings [were] conducted at the bench between Court and counsel, out of the hearing of the jury.)

MR. KLINK: Your Honor, the testimony of the witness came completely without warning, and the reference to other murders is wholly unjustified, and as far as I'm concerned it warrants a mistrial, and I would move for a mistrial at this time. The reference she made was to the other murders. There's absolutely nothing in the record or anywhere that indicates he is a suspect in any other murders.

THE COURT: All right. I will deny the mistrial, but I will strike it from the record and instruct the jury to disregard the last question.

The court then asked the prosecutor to make his question exact to avoid bringing in extra matters. The prosecutor assured the court that he had instructed the witness not to make such statements:

THE COURT: Ladies and gentlemen of the jury, the last answer I ordered stricken from the record so you're not to consider it. It has nothing at all to do with this case and it's not relevant at all so disregard it.

Mr. Windtberg, you may proceed.

Q [by Mr. Windtberg]: Bettye, my question is did the defendant make any statements to you about the murders in Phoenix?

A Yes.

\* \* \* \* \* \*

Q Did he ever say why he did it?

A No.

Q Did he ever say what his attitude was about the people?

A That it wasn't mean.

Q Would you tell us how that came up?

A Well, I don't recall honestly if he was talking about the other people or those people at the time.

The defendant's attorney again objected, and the prosecutor stated:

MR. WINDTBERG: At this point, no, your Honor. I am trying the best I can. I am not getting the responses to the questions that I thought I would get. I will admit that she has been instructed, as I said, not to mention those. She appears to be continually doing that.

THE COURT: She seems determined to bring it in. I'm still going to strike it, and—however, I will consider a motion at a later time \* \* \*.

THE COURT: Ladies and gentlemen of the jury, again I am going to strike the last answer. You're to disregard it. It has no place at all in this case.

Before closing arguments the court read a stipulation to the jury which stated:

You recall yesterday I said you had heard all of the evidence. A matter has come up where I will be re-opening the evidence but just to read to you a stipulation, and you may consider this as evidence.

And that is the defendant—the defendant has never been charged with any other murder nor is he a suspect in any other murder.

So you may consider that as evidence, and that does now close the evidence.

■ The defendant claims Bettye Lamb's reference to "other murders" and "other people" was reversible error and the

trial court should have granted his motion for a mistrial. In support the defendant cites *State v. Kellington,* 93 Ariz. 396, 381 P.2d 215 (1963); *State v. Hunt,* 91 Ariz. 145, 370 P.2d 640 (1962); *State v. Byrd,* 62 Ariz. 24, 152 P.2d 669 (1944); and *State v. Serrano,* 17 Ariz.App. 473, 498 P.2d 547 (1972). The defendant also cites a Washington case, *State v. Suleski,* 67 Wash.2d 45, 406 P.2d 613 (1965), for the proposition that once inherently prejudicial evidence, which is of such a nature that the minds of the jurors are most likely to be impressed, is admitted, withdrawal of the evidence even with an instruction to disregard will not remove the prejudice. We agree that some evidence, once admitted, will so taint the jury as to require a mistrial. We do not agree that was the case here.

The cases cited by the defendant all present facts significantly more egregious than those of the instant case. In *Kellington,* prosecution witnesses testified the accused had prior felony convictions, a fact that should only be admitted into trial if the defendant testified, which he did not, and even then the use of the prior convictions is restricted. *See* Rule 609, Arizona Rules of Evidence, 17A A.R.S. In *Hunt,* prejudicial statements of the accused and testimony the accused had only recently been released from prison were improperly admitted at trial. In *Byrd,* the prosecutor asked a rebuttal witness if the defendant had ever attacked her. The court instructed the jury to ignore the question, but this court nevertheless held that under the facts in that case, the question was improper and prejudicial. Therefore, merely asking the question was sufficient harm to mandate reversal. In *Serrano,* the county attorney elicited testimony from police officers which indicated the defendant previously had dealt with the officers, and, during argument, the attorney explained the police could readily identify the defendant because that case was not the first time the defendant had dealt with the police. The Court of Appeals held the error was prejudicial and reversed the convictions. In *Suleski,* the Washington Supreme Court

held that, even though the jury was instructed to disregard the improper opening statement, the testimony and the attempts to introduce inadmissible evidence so tainted the trial as to require reversal. The court said, "[T]he bells of the dismissed burglary tools charge, prior burglary convictions, a four or five-page F.B.I. record, a possible violation of the Federal Firearms Act, and fruits of the various searches, were so conclusively rung as to effectively preclude their 'unringing.'" *Suleski*, supra, at 51, 406 P.2d at 616.

■ In the instant case, there was no improper or overreaching conduct by the prosecutor. The prosecutor, in fact, instructed Bettye Lamb not to mention extraneous facts, and he tried to phrase questions so she would testify properly. Also, Bettye Lamb's bias against the defendant was evident and the jury could easily disregard her testimony. We have stated:

> When a witness unexpectedly volunteers an inadmissible statement, the action called for rests largely within the discretion of the trial court which must evaluate the situation and decide if some remedy short of mistrial will cure the error. * * * A declaration of a mistrial is the most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted. * * * In the absence of any showing of abuse of discretion, a trial court's denial of a motion for mistrial will not be disturbed on appeal.

*State v. Adamson*, 136 Ariz. 250, 262, 665 P.2d 972, 984, cert. denied, — U.S. —, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983) (citations omitted). Under the facts of this case, and particularly in light of the stipulation read to the jury, we believe any error was cured. The trial court did not abuse its discretion in not granting a mistrial.

## V. Improper testimony

The defendant next contends the court erred in allowing certain testimony of two of the state's witnesses, Sergeant George Kinney and Criminalist Alan Raphael.

Kinney testified about his investigation of the crime. On voir dire he admitted his testimony was based on both his own recollection of the events and his review of police reports which he did not write, and that he could not differentiate the two sources. The defendant objected to the testimony at trial, but the objection was overruled. On redirect, Kinney testified he was present at the investigation of the crime and he reviewed the police report shortly after it was written and made no corrections. Therefore, his observations must have been the same as those of the officer who wrote the report.

■ We agree that at least some of Kinney's testimony was hearsay. Kinney admitted some of his recollections were based on his review of the reports. However, we do not think the defendant was prejudiced by the testimony. Kinney's testimony was that he found what appeared to be blood on the back door of the Silver Dollar Bar. Two other witnesses later testified to the same effect, including the author of the report Kinney used to refresh his memory. The testimony Kinney gave was therefore cumulative, and we find no prejudice or error in admitting it at trial. *Cf. State v. Garcia*, 141 Ariz. 97, 101–102, 685 P.2d 734, 738–739 (1984) (evidence elucidated by leading questions not prejudicial because same evidence was received by proper questioning). We find no error.

■ Raphael testified he saw what appeared to be blood diluted with water inside the Silver Dollar Bar where the defendant was seen mopping up on the night of the crime. The defendant objected to Raphael's conclusion that the blood was diluted, but the objection was overruled. The defendant now claims the objection should have been sustained. We do not agree. Raphael testified as an expert witness for the state. He tested a sample taken from that location and found it was blood, but he did not have a sufficient sample to determine what type. He testified the blood *appeared* to be diluted, and as an expert he was entitled to testify as to opinions under

our rules. Rule 702, Arizona Rules of Evidence, 17A A.R.S. We find no error.

## VI. Two forms of verdict

■ The defendant claims he was denied his right to a unanimous verdict because the jury was given only one form of verdict for first-degree murder, rather than a form for first-degree felony murder and a separate form for first-degree premeditated murder. He admits we have rejected this contention in the past but urges us to reconsider our prior rulings in this matter. We have stated:

> In Arizona, first degree murder is only one crime regardless whether it occurs as a premeditated murder or a felony murder. * * * Although a defendant is entitled to a unanimous jury verdict on whether the criminal act charged has been committed, * * *, the defendant is not entitled to a unanimous verdict on the precise manner in which the act was committed.

*State v. Encinas*, 132 Ariz. 493, 496, 647 P.2d 624, 627 (1982) (citations omitted). We affirm the use of one form of verdict in first-degree murder cases. *See State v. Berndt*, 138 Ariz. 41, 45, 672 P.2d 1311, 1315 (1983). [*See also State v. Kinkade*, 140 Ariz. 91, 95, 680 P.2d 801, 805 (1984).]

## VII. Lesser-included instructions

■ At trial, the defendant requested instructions for second-degree murder, manslaughter, and negligent homicide. A.R.S. §§ 13–1104, –1103, and –1102. He claims the evidence presented at trial supported those instructions, and claims "premeditation" under A.R.S. § 13–1105 necessarily includes the "less serious mental states" required for second-degree murder, manslaughter, and negligent homicide. He bases his claim on A.R.S. § 13–202, and particularly the following subsection:

> C. If a statute provides that criminal negligence suffices to establish an element of an offense, that element also is established if a person acts intentionally, knowingly or recklessly. If acting recklessly suffices to establish an element, that element also is established if a person acts intentionally or knowingly. If acting knowingly suffices to establish an element, that element is also established if a person acts intentionally.

We do not agree. Neither the statute cited nor the case law provides that premeditation, which is a necessary element of first-degree murder, is the same as criminal negligence or intentionally, knowingly, or recklessly killing a person. Premeditation is a more culpable state than the conduct described in the statute.

■ Admittedly, when supported by the evidence, instructions for second-degree murder, manslaughter, or negligent homicide are required in first-degree murder trials. To fail to do so is fundamental error. *See State v. Celaya*, 135 Ariz. 248, 660 P.2d 849 (1983); *State v. Dalglish*, 131 Ariz. 133, 639 P.2d 323 (1982); *State v. Vickers*, 129 Ariz. 506, 633 P.2d 315 (1981). "The evidence, however, must support the giving of a lesser-included offense instruction which may not be given when the state of the evidence is such that the defendant can only be guilty of the crime charged or not guilty at all." *State v. McNair*, 141 Ariz. 475, 482, 687 P.2d 1230, 1237 (1984).

■ The evidence produced at trial in the instant case did not indicate the deaths were caused by intentional, knowing, or reckless conduct, without premeditation, as proscribed by A.R.S. § 13–1104 (second-degree murder); it did not show the deaths were caused by recklessness, an intent to aide a suicide, a killing in the heat of passion, a coerced second-degree murder, A.R.S. § 13–1103 (manslaughter); and there was no evidence of criminal negligence as required in A.R.S. § 13–1102 (negligent homicide). The defendant denied that he was the one who committed the crime and, under the evidence, could only have been found guilty of first-degree murder or not guilty. The trial court properly refused the defendant's requested instructions. *See State v. Noleen*, 142 Ariz. 101, 107, 688 P.2d 993, 999 (1984). We find no error.

## VIII. Instruction on lost or destroyed evidence

Prior to trial, the safety deposit box key which gave access to the money introduced

at trial was disposed of by the evidence custodian. The defendant moved for a mistrial, which was denied, and then, relying on *State v. Willits,* 96 Ariz. 184, 393 P.2d 274 (1964), asked the court to instruct the jury that:

> If you find that the State of Arizona has failed to produce evidence from any source that is peculiarly within its power to provide and the contents, nature or quality of that evidence is crucial to the defense, you may presume that because the evidence was not produced, its results would have been unfavorable to the State of Arizona.

The court refused the instruction, and the defendant claims this was error. The defendant does not claim there was any bad faith or connivance on the part of the state, and bad faith or connivance was not indicated by the evidence.

■ In order for a Willits instruction to be appropriate, a defendant must show the evidence might have tended to exonerate or exculpate him. *See e.g. State v. Perez,* 141 Ariz. 459, 463, 687 P.2d 1214, 1218 (1984). Whether the necessary prejudice was shown is a question for the trial court which will not be reversed absent an abuse of discretion. *Id.* at 464, 687 P.2d at 1219. At trial, the defendant admitted the existence of the key and the money, and he admitted he gave the key to his employer. The police found the money but through an inadvertent error the key itself was discarded. We do not conceive of any exculpatory use the key could have been put to. Indeed, if anything, it would have been inculpatory. We do not think the trial court abused its discretion in not giving the instruction. We find no error. *See also State v. Soloman,* 125 Ariz. 18, 22, 607 P.2d 1, 5 (1980); *State v. Watkins,* 126 Ariz. 293, 301–02, 614 P.2d 835, 843–44 (1980).

## IX. Improper sentencing

The defendant claims the court abused its discretion in sentencing him to the aggravated term of twenty-one years for the robbery conviction because the court utilized the defendant's "extensive arrest record," and because the court did not properly weigh the aggravating and mitigating factors on the record "as required by the statute." The defendant further claims the court, in imposing consecutive sentences, did not comply with A.R.S. § 13–708.

■ Our code states in pertinent part: In determining what sentence to impose, the court shall take into account the amount of aggravating circumstances and whether the amount of mitigating circumstances is sufficiently substantial to call for the lesser term.

A.R.S. § 13–702(E)(5). At sentencing the trial court stated:

> The State has not asked for the death penalty, and I think it's appropriate here. It does not come to the highest level of the aggravation that is necessary for the death penalty, but nevertheless, it was a very brutal crime, and for that reason I feel a more severe penalty is appropriate in this case.

> So I will start with count III which is armed robbery. No legal cause appearing, as to count III, armed robbery, a dangerous offense, it will be ordered that you be sentenced to a term of imprisonment and incarceration for the maximum time allowed by law, which is twenty-one years, and you be committed to the Department of Corrections pursuant to Section 13–701.

> The aggravating circumstances that I find are the nature and extent of your involvement in this crime and that the only apparent motive was robbery. That you have an extensive arrest history and your prior exposure to both probation and parole supervision.

We have held, "[T]he trial judge is in the best position to study the defendant and his discretion in the matter of sentencing will not be disturbed except in the most unusual circumstances provided it is within the statutory limits." *State v. Thomas,* 110 Ariz. 106, 111, 515 P.2d 851, 856 (1973). We do not think, considering the defend-

ant's past arrest record, that the sentence was inappropriate or an abuse of discretion. The trial court did not abuse its discretion in sentencing the defendant to twenty-one years for the robbery. *See State v. Waldrip*, 111 Ariz. 516, 518, 533 P.2d 1151, 1153 (1975).

As to consecutive sentences, our code states:

> If multiple sentences of imprisonment are imposed on a person at the same time, `* * *` the sentence or sentences imposed by the court shall run concurrently unless the court expressly directs otherwise, in which case the court shall set forth on the record the reason for its sentence.

A.R.S. § 13–708. The trial court did not expressly state its reasons for imposing consecutive sentences while in the act of imposing those sentences. The court did, however, state the crime was a very brutal one, and that therefore "a more severe penalty [was] appropriate." As our Court of Appeals has noted:

> Appellant complains that the court did not state the reason for the consecutive sentences as required by A.R.S. § 13–708. The court stated the reasons for imposing maximum sentences when giving the aggravated terms. The reasons need not be stated twice, one to comply with A.R.S. § 13–702(C) and once to comply with A.R.S. § 13–708. The reasons appear in the record.

*State v. Bishop*, 137 Ariz. 5, 9, 667 P.2d 1331, 1335 (App.1983).

We have searched the record for fundamental error pursuant to A.R.S. § 13–4035, *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and *State v. Leon*, 104 Ariz. 297, 451 P.2d 878 (1969), and find none.

The convictions, judgments, and sentences of the defendant are affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and FELDMAN, JJ., concur.