735 P.2d 761

**STATE of Arizona, Appellee,**

v.

**Clarence Wayne DIXON, Appellant.**

**No. CR 86–0006–AP.**

Supreme Court of Arizona,
In Banc.

March 19, 1987.

**152**

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Janet Keating, Asst. Attys. Gen., Phoenix, for appellee.

John Ellis Ellsworth, Flagstaff, for appellant.

CAMERON, Justice.

Clarence Wayne Dixon, defendant, was convicted of aggravated assault, A.R.S. § 13–1204(A)(2), kidnapping, A.R.S. § 13–1304(A)(3), sexual abuse, A.R.S. § 13–1404, and four counts of sexual assault, A.R.S. § 13–1406, all dangerous offenses committed while on parole. A.R.S. § 13–708. Defendant was sentenced to life imprisonment on each count with the sentences to run consecutively. A.R.S. §§ 13–604(G), –604.-02(A), –708. We have jurisdiction pursuant to Ariz. Const. art. XI, § 5(3) and A.R.S. §§ 13–4031, –4033, –4035.

The issues to be decided on review are

A. Was there probable cause to arrest the defendant?

B. Were the pretrial identifications of the defendant reliable?

C. Was the state's tracking witness qualified to testify as an expert?

D. Were seven consecutive life sentences

1. improperly imposed, or

2. unconstitutionally excessive?

On 10 June 1985, at approximately 10:30 a.m., defendant assaulted the victim in an area south of the Northern Arizona University (NAU) campus, in Flagstaff. The victim, a 20–year–old NAU student, was jogging on Lone Tree Road after it turned into a dirt road. Defendant came up from behind the victim and, threatening her with a knife, told her, "I'm gonna take you up there and fuck you and leave you there." Defendant dragged the victim off the road and into a secluded clearing in the forest. After tying her hands behind her with a rope, defendant undressed his victim and removed her running shoes. Defendant forced her to engage in numerous sexual acts, all of the time wielding the knife in one hand and threatening her.

Afterwards, defendant became remorseful and requested that the victim cut him, offering her the knife. The victim refused. Defendant, relenting on his earlier threat to leave the victim naked, returned her clothes and shoes, but promised that he would be out of town before she could report him to the police.

### A. Probable Cause to Arrest

The victim returned to her NAU dorm where she was a resident assistant. The NAU police were called and the victim was taken to the Flagstaff Hospital where she received medical treatment.

The victim gave a description of her assailant to Officer Bolson of the NAU Police Department. Before noon, the police broadcast an "attempt to locate" call for a male Indian about six feet tall, thin build, with long, black hair in a ponytail, wearing blue Levi jeans, a tan tank top with horizontal stripes, blue tennis shoes with white stripes, and a pair of wire-rim glasses. The attempt to locate call indicated that the suspect had told the victim that he would be leaving the Flagstaff area immediately.

Officer Michael Terrin, of the Flagstaff Police Department, testified that he heard the attempt to locate call, including the description of the sexual assault suspect, where the assault occurred and the sus-

pect's intention to leave Flagstaff immediately. Officer Terrin was patrolling an area near where the assault had occurred, Lone Tree Road and Interstate 40. Shortly after noon, he spotted defendant attempting to hitchhike, with a sign stating Albuquerque. Officer Terrin stopped and talked to defendant and, according to routine departmental procedure, filled out a field interview card. Defendant mentioned during the interview that he had been in the Arizona State Penitentiary. Officer Terrin radioed in for a more detailed description of the suspect. After confirming that the suspect had black hair to the middle of his back in a ponytail, wire-rim glasses and blue striped shoes, Officer Terrin arrested defendant.

This was a reasonable investigatory stop. *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Winegar*, 147 Ariz. 440, 446, 711 P.2d 579, 585 (1985) (CAMERON, J., specially concurring). We must, therefore, determine if there was probable cause to arrest.

Probable cause to arrest exists where the arresting officer has reasonably trustworthy information sufficient to lead a reasonable person to believe that an offense has been committed and that the person to be arrested committed it. *State v. Nelson*, 129 Ariz. 582, 586, 633 P.2d 391, 395 (1981). Only the probability and not a prima facie showing of criminal activity is the standard of probable cause. *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). When assessing whether probable cause exists, "we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1888 (1949).

> [P]robable cause ... is [a] reasonable ground of probability supported by circumstances sufficiently strong in themselves to warrant a cautious man in be-

lieving the accused guilty. 'Probable cause' or 'reason to believe', therefore, is like a third-quarter percentile: it is more information than would justify the officer in saying, 'From all the circumstances I suspect this man'; but it need not be such information as would justify the officer in saying, 'From all the circumstances, I know this is the man'.

*Monroe v. Pape*, 221 F.Supp. 635, 642–43 (N.D.Ill.1963) (footnote omitted).

■ In the instant case, Officer Terrin had sufficient information to believe a rape had been committed and that defendant had committed it. Defendant closely matched the victim's description, except for his T-shirt which was white and a four-inch difference in height. After stopping defendant, Officer Terrin confirmed by police radio that the suspect's ponytail reached the middle of his back and that he was wearing blue running shoes with white stripes and dark wire-rim glasses, all of which matched the defendant. Additionally, Officer Terrin knew that the crime had been committed nearby and that defendant was attempting to leave Flagstaff. Indeed, under these circumstances, Officer Terrin justifiably could have been criticized had he left defendant on the highway to hitchhike out of town. Defendant's fourth amendment rights were not violated by his arrest. The trial court was correct in denying defendant's motion to suppress evidence gained as a result of his arrest.

### B. Pretrial Identification Procedures

Following defendant's arrest, the police transported him directly to the Flagstaff Hospital parking lot. After taking a Polaroid photograph of defendant, the police compiled a photographic lineup.

Officer John Bolson of the NAU Police Department created and showed the photographic lineup to the victim. Officer Bolson testified that the victim, without hesitation, pointed to the photograph of the defendant, remarking "That's him, but he's changed his clothes." Police then positioned the defendant in the parking lot so that the victim could view him through a

hospital window. The victim again identified defendant as her assailant. Defendant was standing in the parking lot with two police officers, one in uniform. The victim also identified the defendant at the trial.

Defendant first contends that the photographic lineup was unnecessarily suggestive because only he had hair long enough to wear in a pony tail and only he was wearing glasses with lenses so dark that his eyes could not be seen. Furthermore, defendant contends, the victim's viewing him alone in the company of two police officers shortly after identifying his photo in the line-up is not only unnecessarily suggestive but unreliable. We do not agree.

■ To determine whether a defendant has been denied due process of law because of a pretrial identification procedure, the trial court must first determine whether the pretrial identification procedure was unnecessarily suggestive. If suggestive, then the court must examine the totality of the circumstances surrounding the identification in order to determine the reliability of the identification. *Manson v. Brathwaite*, 432 U.S. 98, 114–16, 97 S.Ct. 2243, 2253–54, 53 L.Ed.2d 140, 154–55 (1977); *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972); *State v. Chapple*, 135 Ariz. 281, 286, 660 P.2d 1208, 1213 (1983).

A photographic lineup is not unduly suggestive due to subtle differences in the photographs. *State v. Via*, 146 Ariz. 108, 119, 704 P.2d 238, 249 (1985), *cert. denied*, 475 U.S. 1048, 106 S.Ct. 1268, 89 L.Ed.2d 577 (1986). "Lineups need not and usually cannot be ideally constituted. Rather, the law only requires that they depict individuals who basically resemble one another such that the suspect's photograph does not stand out." *State v. Alvarez*, 145 Ariz. 370, 373, 701 P.2d 1178, 1181 (1985) (citations omitted).

■ After examining all of the photographs, we do not believe that defendant's photograph stands out. Admittedly, there are subtle differences between defendant's photograph and the others, as there are between the other photographs. The six photographs depict six Indian males of similar ages. Four of the men are wearing glasses, two pairs have metal frames, two have plastic frames. All of the lenses of the glasses appear tinted; defendant's are the darkest. All of the men have dark brown to black hair. Although several of the men have obviously short-cut hairstyles, the length of hair on three of the men is not readily evident. Furthermore, the defendant's ponytail does not appear in the photo. The respective heights of the men cannot be determined from their photos. We do not find the photo line-up suggestive.

Neither do we find the view of the defendant in the parking lot unreliable. A one-man show-up at the scene of the crime or near the time of the criminal act is permissible police procedure and can be reliable. *State v. Hicks*, 133 Ariz. 64, 67, 649 P.2d 267, 271 (1982). To determine whether such identification was reliable, we have utilized the factors set forth in *Neil v. Biggers, supra:* 1) The opportunity of the witness to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of the witness' prior description; 4) the level of certainty demonstrated by the witness at the confrontation; and 5) the length of time between the crime and the confrontation. *State v. Hicks*, 133 Ariz. at 68, 649 P.2d at 267.

■ Applying these factors to the instant case, we find the following. 1) The victim had ample opportunity to view the defendant during the assault. The victim was in close, physical proximity to defendant for approximately twenty minutes. 2) The victim paid close attention to the defendant. She testified that for her job as resident assistant, she had been instructed to concentrate on remembering an accurate description of any assailant. The victim testified that, during the assault, she tried to fix a mental image of her assailant. 3) The victim gave the police a detailed description of her assailant. The single inaccuracy was her estimating his height at about six feet when defendant is actually five feet, eight inches tall. We do not believe this discrepancy makes the general

description suspect. With this description, the police were able to arrest defendant. Also, the victim made a positive identification from the photo line-up within a few hours of being assaulted and raped. 4) The victim was certain of her identification. When presented with the photo line-up, the victim examined all of the photos and then selected the defendant's photo, commenting, "That's him, but he's changed his clothes." At the show-up in the hospital parking lot, the victim also positively identified defendant as her assailant. 5) The time between the crime and the identification was but a few hours. We find no error in the pretrial and trial identifications of the defendant by the victim.

### C. Expert Qualifications

Shoe imprints were found at the scene of the crime but no casts were made. At trial, the state called Bernell Lawrence as an expert witness to testify as to the tracks left by the assailant and the victim. Mr. Lawrence had many years of experience as a tracker and crime-scene reconstructionist. Mr. Lawrence testified as to his years of experience tracking, in particular for various law enforcement agencies. The defendant filed a motion in limine to preclude Mr. Lawrence from testifying that the shoe-print tracks left at the scene were made by defendant. The trial judge denied the motion. Mr. Lawrence testified that the shoe prints found on the dirt road where the victim was assaulted matched the soles of the victim's running shoes and of the tennis shoes worn by defendant when arrested. Mr. Lawrence reached his opinion by fitting defendant's shoe into the track and by comparing the tread on the soles to their print in the dirt.

■ The primary concern in the admission of expert testimony is whether the subject of inquiry is one of such common knowledge that people of ordinary education could reach a conclusion as intelligently as the expert witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. *State v. Dickey*, 125 Ariz. 163, 169, 608

P.2d 302, 308 (1980). "The court must determine in each case whether the expertise of the witness is applicable to the subject about which he offers to testify. A witness must indicate that his training and experience qualify him to render enlightened opinions and draw sophisticated conclusions from the particular type of evidence available...." *Englehart v. Jeep Corp.*, 122 Ariz. 256, 258, 594 P.2d 510, 512 (1979). Whether a witness is competent to testify as an expert is a matter primarily for the trial court and largely within its discretion. *Id.* We will not overrule the trial judge's decision in this regard unless there is clear abuse of discretion.

■ Although defendant conceded Mr. Lawrence's tracking expertise, defendant objected to his offering opinion testimony that defendant's shoes matched the tracks left in the dirt because Mr. Lawrence did not use any scientific methods or tools that would allow him to compare the shoes and the tracks any better than a layman could. Admittedly, had there been a plaster cast of the shoes, the jury would have been able to compare the shoes with the cast and an expert witness would not have been necessary. As no casts were taken, the expert tracker could give his opinion to the jury. This conclusion was beyond the common experience of the average juror. We find no abuse of discretion by the trial court.

### D. Consecutive Sentencing

1. Were the sentences improperly imposed?

Defendant was found guilty of aggravated assault, a Class 3 felony; kidnapping, a Class 2 felony; sexual abuse, a Class 5 felony; and four counts of sexual assault, each a Class 2 felony. The jury found each count to be a dangerous offense. Prior to sentencing, defendant admitted that he was on parole for prior felony convictions at the time of the assault, 10 June 1985.

At sentencing, the trial court found as aggravating circumstances the threatened infliction of serious physical injury, the emotional harm caused to the victim, and the defendant's prior felony conviction

within ten years. The trial court found no mitigating circumstances. Because the offenses involved the use of a dangerous instrument, and defendant was on parole at the time of the assault, the trial court sentenced defendant to life imprisonment on each count, pursuant to A.R.S. § 13–604.02(A). Additionally, the trial court ordered that the life sentences run consecutive to each other, stating

The choice I have to make seems to me to depend on a question of whether you will change and whether you will be a safe person 25 years from now.

It seems to me that you have been a dangerous person for at least the last seven years, virtually all of your adult life.

I think that our Department of Corrections does not rehabilitate people with serious, deep-set psychological problems, and I think you have one, so I think that we are looking at a situation where rehabilitation is perhaps nothing more than a hope.

I think that these were particularly vile crimes and that the verdicts of the jury were well supported by the evidence.

It is my sentence that you be imprisoned for an aggravated term. By statute, because these were dangerous crimes committed while you were on parole or other release status, you must be sentenced to life imprisonment on each of them, and that is my sentence.

Where I do have discretion is in making them consecutive or concurrent. It is my sentence that they shall run consecutive to each other.

■ Defendant contends that the trial court's record does not set forth in the record the reasons for consecutive sentences as required by A.R.S. § 13–708. To support his contention that no specific reasons for consecutive sentences appear in the record, defendant relies on *State v. Sanchez*, 130 Ariz. 295, 635 P.2d 1217 (App. 1981).

In *State v. Sanchez*, the court of appeals refused to speculate whether the trial judge intended the language appearing in the record to constitute the enumerated reasons. *Id.* at 301, 635 P.2d at 1223. The court recommended that trial judges preface an enumeration of the reasons justifying consecutive sentences with the statement, "I am imposing consecutive sentences because...." *Id.*

Although we agree that such language would be helpful, it is not required by A.R.S. § 13–708. *State v. Day*, 148 Ariz. 490, 498, 715 P.2d 743, 751 (1986). If the court states in the record the aggravating circumstances requiring the imposition of maximum sentences, the court need not repeat the aggravating factors as reasons for imposing consecutive sentences. *State v. Lamb*, 142 Ariz. 463, 474, 690 P.2d 764, 775 (1984) (the reasons need not be stated twice, once to comply with A.R.S. § 13–702 and once again to comply with A.R.S. § 13–708 (consecutive sentence)); *accord State v. Fatty*, 150 Ariz. 587, 591–92, 724 P.2d 1256, 1260–61 (App.1986); *State v. Bishop*, 137 Ariz. 5, 9, 667 P.2d 1331, 1335 (App.1983). *See also State v. Noble*, 152 Ariz. 284, 731 P.2d 1228 (1987); *State v. Devine*, 150 Ariz. 507, 509, 724 P.2d 593, 595 (App.1986) ("the Defendant is unpredictably violent ... and ... a danger to society.").

Here, the trial court not only found aggravating circumstances, but he also discussed the improbability of defendant's rehabilitation. In so doing, the trial court complied with the requirements of A.R.S. § 13–708 in sentencing defendant to consecutive sentences. We find no error.

2. **Were the sentences unconstitutionally excessive?**

■ Defendant contends that the statutorily permissible sentence imposed here is so severe that it offends the principles of contemporary society and thereby the Eighth Amendment. *State v. Mulalley*, 127 Ariz. 92, 618 P.2d 586 (1980). We do not agree. We believe consecutive terms, as provided for by A.R.S. § 13–708, are justified by the gravity of the offenses and particularly the emotional harm the defendant inflicted upon the victim; the use of a dangerous weapon; and defendant's past

criminal record, and failure to benefit from previous treatment opportunities. Also, the sentence is not so harsh as to "shock the moral sense of the community." *State v. Taylor*, 82 Ariz. 289, 294, 312 P.2d 162, 166 (1957). Neither is it disproportionate to other cases in this state. *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). *See, e.g., State v. Day*, *supra* (nine consecutive life terms plus a consecutive term of 11.25 years for sexually assaulting eight women, including two minors, among other criminal acts); *State v. Meeker*, 143 Ariz. 256, 693 P.2d 911 (1984) (three consecutive life terms for armed robbery and aggravated assault not an abuse of discretion).

We also believe this result is not disproportionate to cases in other jurisdictions. *See Rummel v. Estello*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980); *California v. Bestelmeyer*, 166 Cal.App.3d 520, 212 Cal.Rptr. 605 (1985) (sexual abuse of 11–year-old stepdaughter; 129 years); *Walker v. State*, 53 Md.App. 171, 452 A.2d 1234 (1982) (attempted rape and burglary while carrying a deadly weapon; life plus 23 years imprisonment). The sentence was neither arbitrary nor capricious, and is not cruel or unusual. There was no abuse of discretion.

We have reviewed the record for fundamental error, A.R.S. § 13–4035, and have found none. The judgments of conviction and the sentences imposed are affirmed.

GORDON, C.J., and HOLOHAN, J., concur.

FELDMAN, Vice Chief Justice, concurring.

I concur in the result and in the majority's analysis. I write separately only because—even assuming it is possible under the eighth amendment—I doubt that the courts may impose seven consecutive life sentences on defendant for sexually assaulting one victim. Although the issue has not been squarely raised by the parties or dealt with in the opinion, I believe that A.R.S. § 13–116 limits the court's power to impose seven consecutive sentences. Not all of the acts committed by defendant were separate acts. *See State v. Noble*, 152 Ariz. at 287 nn. 2 and 3, 731 P.2d at 1231 nn. 2 and 3 (1987). Because it is academic at best to debate whether defendant should serve "only" four or five as opposed to seven consecutive life sentences, I believe it best that the court has left the issue to abide another day and another case.