675 P.2d 289

**The STATE of Arizona, Appellee,**

v.

**Charles Anthony SNOWDEN, Appellant.**

**No. 2 CA–CR 2701.**

Court of Appeals of Arizona,
Division 2.

Nov. 7, 1983.

Review Denied Jan. 24, 1984.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Gerald R. Grant, Asst. Attys. Gen., Phoenix, for appellee.

Michael B. Bernays, Tucson, for appellant.

## OPINION

BIRDSALL, Judge.

The appellant was convicted of armed robbery, kidnapping and burglary in the first degree. He received three concurrent seven-year sentences.

On appeal he contends (1) the jury should not have had a tape-recording admitted as an exhibit during its deliberations; (2) the initial stop of the appellant was illegal; (3) evidence that *Miranda* warnings were given should not have been permitted; (4) statements of an alleged co-conspirator should not have been permitted, and (5) the appellant was denied a fair trial by the cumulative effect of the errors and the prosecutor's conduct. We affirm.

At around 9 a.m. on June 25, 1981, Kathryn O'Brien was working at a Pizza Hut restaurant in Tucson. The restaurant had not opened for business for the day and she was preparing dough in the rear of the store. As she worked, Kenneth Kemp came in through the back door with a gun in his hand. He told her that he wanted money and would not hurt her. She opened the cash register and a floor safe and Kemp removed over $200. Kemp ordered her to lie face down on the floor. When she complied, he called out, "Come on in, partner." Ms. O'Brien did not see or hear a second person, but felt someone tying her hands while a second person tied her feet. After hearing the back door close, she waited several minutes before freeing herself and calling the police. She described Kemp as a black man with dark, kinky hair, a stocky build, wearing tennis shorts and a white, three-button pullover shirt with dark sunglasses.

Deputy James Bawulski was on duty that morning in his patrol car. After hearing the radio report of the robbery which first went over the air at about 9:35 a.m., he began searching the area for suspects. When a dispatcher broadcast a description of the man that Ms. O'Brien had seen he stopped to copy it down. At this point, a car passed by and the deputy noticed that the passenger, who matched the description of the robber, was watching him. He then followed the car to a Circle K, where both the driver and the passenger got out and went into the store. The deputy continued to watch the two men and a short time later the driver, who was later identified as the appellant, came outside. He looked at the deputy, walked quickly to the car, got in, and started the engine. The appellant honked the horn and began back-

ing up, whereupon the deputy blocked his path with his patrol car. The passenger, later identified as Kemp, then came out of the store, looked at the deputy, and went back in the store. He came out shortly thereafter carrying a brown paper bag and walked to the car. Deputy Bawulski told Kemp to wait, but Kemp told the deputy to wait while he put the bag down. Kemp opened the door, set the bag on the floor, and reached into a knapsack, pulling out a revolver. Seeing this, Deputy Bawluski drew his own gun and ordered Kemp to freeze. When Kemp dropped his gun, the deputy ordered appellant out of the car. Both appellant and Kemp were taken into custody.

### Tape-Recording

The issue raised on appeal does not concern the admission of this exhibit, but rather the fact that the jury was permitted to have it during deliberations. The tape-recording was of the victim's call to the police emergency number, 911. In this call, Ms. O'Brien relates the facts we have already detailed, including her belief that there were two robbers. At one point during the call, there is a knock at the back door of the Pizza Hut and she states repeatedly, "Oh, God, I'm scared" and that she was "scared to death". The appellant argues that her fright is apparent from the emotion in her voice.

The appellant objected both to the admission of the exhibit, and later, to permitting the jury to have it during its deliberations. On appeal, we are concerned only with the court's ruling on the latter objection.

■ Whether tangible evidence should be given to the jury for use during deliberations is a matter left to the discretion of the trial court. Rule 22.2(d), Rules of Criminal Procedure, 17 A.R.S. Absent an abuse of that discretion, we will not find such a ruling erroneous. We considered this question in *State v. Kennedy*, 122 Ariz. 22, 592 P.2d 1288 (App.1979), citing with approval a Kansas opinion holding that an exhibit, a signed confession, was properly allowed to go to the jury room.

Although there is some authority supporting the appellant's position, *see State v. Payne*, 199 Wis. 615, 227 N.W. 258 (1929), the trial court and this court on review must consider each case on its merits.

The appellant argues that the tape-recording contained the victim's entire account of the robbery and further would unduly arouse the passions of the jury because of her obvious terror. After the jury returned its verdicts, the trial judge voir dired the jury and it was learned they played the tape eight times. From this the appellant contends the tape unfairly influenced the verdicts.

■ We find no abuse of discretion. The tape was clearly admissible—it was not impeachment evidence such as we find involved in some of the reported cases. *See State v. Payne, supra*, and *People v. Carr*, 10 Ill.Dec. 642, 368 N.E.2d 128, 53 Ill. App.3d 492 (1977). We are not persuaded by the fact that the jury played the tape several times during deliberations. That fact does not prove that undue prominence was given to the exhibit. It proves only that it was played eight times.

■ We do not approve the trial court's voir dire of the jury regarding the tape-recording. Neither the trial court nor this court is permitted to consider any inquiry into the subjective motives or mental processes leading a jury to assent or dissent from the verdict. Rule 24.1(d), Rules of Criminal Procedure, 17 A.R.S. The appellant's argument would have the court violate that rule. If the inquiry which the trial court made here is approved, then the jury might next be asked how many times they looked at a gruesome picture or even whether they considered an exhibit at all. The practice is fraught with trouble and is to be discouraged.

■ The trial judge is given the discretion to determine which exhibits shall go with the jury for good reasons. The judge has seen and heard the witnesses and is familiar with all the exhibits. In such instances, we will not substitute our judgment for that of the trial court since the

decision involves consideration of all these matters. *See State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983).

### Initial Stop

The appellant moved to suppress all evidence resulting from the stop and the arrest, claiming that it was illegal. The trial court properly denied that motion.

At the time of the stop at the Circle K, the officer had the report of the robbery. He was in the vicinity. He knew two persons were involved and had an automobile. He had a description of Kemp and his clothing. He saw that the passenger in the car matched that description. These facts were enough to justify an investigatory stop based on a reasonable belief that criminal conduct had occurred and the car's occupants might be involved. *See State v. Graciano*, 134 Ariz. 35, 653 P.2d 683 (1982).

The appellant contends the "stop" was really an "arrest" requiring probable cause. Every stop requires some detention. We refuse to make such a technical distinction under the facts presented here. The officer's actions were permissible. *See State v. Smith*, 136 Ariz. 273, 665 P.2d 995 (1983).

### Evidence of Miranda Warnings

In the Circle K parking lot, after their arrest, the two men were given *Miranda* warnings. Neither made any statements. The appellant contends the admission of the following testimony implied that he exercised his right to remain silent and therefore violated his due process rights:

"Q. (by Mr. Stevens): What happened after the other deputy got there and confirmed that the pistol was there?

A. (by Deputy Bawulski): After he confirmed, he came back around. I took out my handcuffs and handcuffed both suspects.

Another deputy arrived a short time after that. I was a little upset. I asked him if he could read them their *Miranda* warnings.

Q. And were you present when one of the deputies read the *Miranda* warnings?

A. No, I was towards the front. I had come back and asked them to give—if he read them the warnings. He stated he had forgotten his deputy-issued rights card. The other deputy had read the warnings."

We do not agree. The evidence does not constitute or even suggest an exercise of his Fifth Amendment rights. *See State v. Oppenheimer*, 138 Ariz. 120, 673 P.2d 318 (1983).

### Co-conspirator Statements

First, we are concerned with a statement made by Kemp while the victim was lying face down on the floor. He called out, "Come on in, partner." The statement was admissible since it was made by a co-conspirator during the course of the conspiracy. Rule 801(d)(2)(E), Rules of Evidence, 17A A.R.S.; *State v. Politte*, 136 Ariz. 117, 664 P.2d 661 (App.1983); *State v. Nightwine*, 138 Ariz. ——, 671 P.2d 1289 (App.1983). We considered availability of the witness and confrontation arguments in *Nightwine* and held that when reliability of the witness was established to the satisfaction of the trial court, the statements were properly admitted. In the instant case, we believe the trial court properly admitted the testimony of the victim even assuming arguendo that nonavailability of the declarant (Kemp) was not shown.

Second, at the scene of the arrest just before the giving of the *Miranda* rights, Kemp was observed mumbling something to Snowden. The appellant argues this was hearsay by conduct and objected to testimony of the officer concerning that conduct. Since that evidence did not prove anything other than the fact of the mumbling, it was not hearsay. Hearsay by conduct, like hearsay, is evidence offered to prove the truth of some asserted fact. The appellant can only speculate as to what was said or what could be inferred from the conduct. He argues that it showed they knew each other. It shows no

such thing. It could just as readily be argued that it showed they did not know each other. We find no error.

### Fair Trial

Finally the appellant argues that the alleged errors we have considered together with a statement of the prosecutor in closing argument amounted to a violation of his right to a fair trial. We disagree. The prosecutor's closing argument included the following:

> "Do you think its credible that a pro, as we know Kemp is, is going to let him sit out there—I don't mean to be racial about this, please believe me on that—do you think you're going to leave a black guy out there in a car, or a big car while a robbery is going on? Do you really think that Kemp, who is a pro, is going to let him sit out there for five minutes, six minutes, seven minutes where he can be seen. Not in a million years."

He contends this was an impermissible racial argument. He argues the jury would be prejudiced because Kemp and the appellant were black.

There was no objection to this argument. If it was error it was not fundamental error. The test for reversible error is whether the argument called the attention of the jurors to matters they could not properly consider. *State v. Zaragoza,* 135 Ariz. 63, 659 P.2d 22 (1983). The remark was not of a highly prejudicial nature, so likely to inflame or bias the jury as to deny defendant his right to a fair trial. Even under the higher standard of scrutiny applied in cases where the question of a prosecutor's allegedly improper comment has been properly preserved for appeal, we would be unable to say this comment probably influenced the jury's verdict. *State v. Smith,* 138 Ariz. 79, 673 P.2d 17 (1983); *State v. Sullivan,* 130 Ariz. 213, 635 P.2d 501 (1981). The jury was entitled to consider the evidence argued by the state.

Affirmed.

HOWARD, C.J., and HATHAWAY, J., concur.