783 P.2d 1184

The STATE of Arizona, Appellee,

v.

Bruce P. DUMAINE, Appellant.

No. CR–84–0344–AP.

Supreme Court of Arizona,
In Banc.

Nov. 7, 1989.

D. Jesse Smith, Tucson, for appellant.

Robert K. Corbin, Atty. Gen. by Jack Roberts, Asst. Atty. Gen., Phoenix, for appellee.

## OPINION

CAMERON, Justice.

### I. JURISDICTION

Defendant, Bruce Dumaine, also known as Bruce Menard, was convicted of first degree murder (A.R.S. §§ 13–451, 13–452 and 13–453(A)) and armed robbery (A.R.S. §§ 13–641 and 13–643(A)). He was sentenced to life imprisonment with no possibility of parole for twenty-five years, with a concurrent sentence of five years for the armed robbery. Defendant appeals from both convictions, and seeks review of the trial court's denial of post-conviction relief pursuant to 17 A.R.S. Rules of Crim.Proc., Rule 32. We consolidated defendant's Rule 32 review with his appeal. This court has jurisdiction under Ariz. Const. art. 6, § 5(3), A.R.S. §§ 13–4031 and 13–4033, and 17 A.R.S. Rules of Crim.Proc., Rule 32.

### II. ISSUES

A. Was the state's witness, John Lesson, coerced by the prosecutor and the judge into testifying against the defendant?

B. Was this case so permeated with prosecutorial misconduct that defendant was denied a fair trial?

C. Was it improper for the trial court to fail to instruct the jury on the issues of self-defense, defense of a third person, and manslaughter?

D. Did the trial court properly deny the defendant's petition for rehearing pursuant to Ariz.R.Crim.P. 32, 17 A.R.S.?

### III. FACTS AND PROCEDURAL BACKGROUND

#### A. *Trial*

The victim, Frank Malloy, the victim's brother-in-law, Michael Brown and the defendant's brother, Tom Menard, worked together at the College Life Insurance Company. Both Brown and Menard were involved in marijuana transactions with the victim. Menard lent the victim money at 50% interest to purchase marijuana. The victim purportedly bought the marijuana in Phoenix or Tucson and sold it at a profit in Illinois.

On or about 26 August 1976, Brown cashed checks which totaled $4,000 and gave the money to the victim for the purpose of purchasing marijuana. Brown testified that the victim added more money and put $6,800 in an envelope and placed it in the glove compartment of his automobile. The victim told Brown that Tom Menard had supplied $1,000 of that money.

On 27 August 1976, at about 11:00 p.m., the victim's wife, Linda Malloy, picked up the telephone and overheard her husband agree to meet Menard that evening. Menard testified that he called the victim because he had lent the victim money and wanted repayment. The victim then left to meet Menard at the O.K. Corral Bar, carrying an envelope in his hand. According to Menard's testimony, he and the defendant, Bruce Dumaine, arrived at the O.K. Corral, but the victim did not appear. The victim's wife reported him missing shortly thereafter.

The victim's automobile was found in the parking lot of the Golden Pins Bowling Alley. On 6 September 1976, the victim's body was discovered in a shallow grave on the northwest side of Tucson. The body had been lying in the desert for seven to ten days and contained four or five bullet wounds.

At trial, Edward Brucker, M.D., a pathologist, testified that one bullet entered the top of the victim's head. A second, and perhaps third bullet entered the neck and

the last two bullets entered the small of the back, one on each side, and traveled downward toward the spinal cord. The pathologist testified that to inflict the head wound, the murderer was either in a tree above the victim or the victim was bent over or lying flat on the ground.

Menard and defendant were both suspects in the murder and were initially questioned by Detective Michael Sullivan, the lead investigator on the case. Defendant gave a taped statement denying any involvement in the killing. No arrests were made at that time.

During the latter part of 1976 and early 1977, Toni Noble and John Lesson operated a "modeling studio" in Tucson that was also a front for prostitution. Sharon Feola worked there, and she and Toni Noble eventually met defendant, who moved into the studio for a period of time as a night watchman.

Feola testified that defendant was usually in possession of a shotgun and a couple of handguns. She further testified that defendant often talked about killing somebody.

Noble believed that she could communicate with the dead by "clacking" black and white rocks together. In December 1976, Noble, Feola, and defendant took part in a "clacking session" at the studio. Defendant told Noble that "a guy" was bothering him and requested her to "bring him out" because he wanted to apologize. Noble began "clacking." Noble testified that the room temperature began to change and Feola testified that defendant became very nervous and scared. Noble told defendant a man was present and defendant asked Noble to ask him, the "presence", what he wanted. The "presence" told Noble to ask defendant "why." According to Noble, defendant responded that "he did it for money and he was very sorry about it." Defendant also stated that the victim had held on to him and the more he shot him, the harder he held on, begging for his life.

Some time after the clacking session, defendant told Noble that "the person involved also had a weapon and he [defendant] thought that someone with him had

been injured and this is why he started to shoot." On cross-examination, Noble stated:

[B]ut he told me that he thought that his brother had been injured and that that's why the shooting took place, because this other person had a gun and took it out and fired it. The other person had fired it at his brother and the other person was shot and killed.

Noble further testified that defendant never said the name of the victim at the clacking session or any time thereafter. According to Noble, she first heard the victim's name from the police. Also, she stated that Detective Michael Sullivan continually harassed and threatened her in 1976 and 1977 to provide "concrete evidence" against defendant for the killing. Noble testified that Detective Sullivan threatened to jail her for her activities in running a bordello if she would not cooperate in providing evidence.

Feola testified that Detective Sullivan threatened to jail her and have her daughter taken away from her if she refused to provide evidence against defendant. Feola further testified that prior to the "clacking session" defendant bragged about killing someone and that she thought he was joking.

After defendant was arrested, he was placed in a cell with Mark McCloud. McCloud testified that defendant told him that he committed the murder and that the police could not prove it. According to McCloud, defendant said that the victim was an insurance salesman. McCloud also testified that defendant told him that he and his brother Tom Menard cleaned out the victim's office on the night of the murder and began bar hopping. When they ran out of money, Menard remembered that the victim owed him money for drugs. They called the victim and asked him to meet them at a bar. The victim met them and they proceeded to the desert. Defendant then shot the victim with two guns (one a Smith and Wesson) once in each hip and three times in the head. Afterwards, he and his brother broke into the victim's

home and stole $6,800 and fifty pounds of marijuana.

On cross-examination, defendant's counsel brought out McCloud's prior record and the fact that he had received a plea bargain from the state in exchange for his testimony. Defendant also brought out the fact that McCloud was facing a long sentence and that a detainer had been placed on him in Idaho. In return for McCloud's testimony, he was offered unsupervised probation and the dropping of the Idaho detainer.

Defendant testified on his own behalf and denied killing Malloy, claiming he was helping his brother move furniture when the murder occurred. He gave a different version of the "clacking session," stating that he was just playing along with Noble and Feola. He also testified that he had discussed the matter with McCloud, but denied confessing to him.

The jury convicted Dumaine of first degree murder and armed robbery. Defendant timely appealed from his conviction.

## B. *Post Conviction Hearing*

While the appeal was pending, the defendant's new counsel filed a petition for post-conviction relief, seeking a new trial based on the state's failure to disclose evidence favorable to the defense. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Rule 15.1, Rules of Crim.Proc., 17 A.R.S. Defendant alleged that the *Brady* violation was the withholding of Detective Sullivan's mental condition at the time of his investigation, as well as at the time of trial.

At the hearing, testimony was presented concerning Detective Sullivan's career path after January of 1977. Sullivan was a deputy for the Homicide Division of the Pima County Sheriff's office in 1976 and 1977, and for some length of time before then. On 27 February 1977, Sullivan was demoted to patrol officer in the Pima County Sheriff's office. The reasons for his demotion are unclear.

On 28 March 1977, Sullivan was involved in an on-duty shooting in which a University of Arizona employee was killed. He was cleared of any culpability in the shooting but was assigned a desk job. He took a vacation after being evaluated by the Sheriff's department psychologist, Dr. Kevin Gilmartin. In that evaluation, the psychologist concluded that Sullivan was not suffering from any mental disorder. A short time thereafter, Sullivan traveled to Chicago and turned himself in to the Chicago police department claiming he committed a homicide. There was some question in Dr. Gilmartin's mind as to whether he was referring to the homicide in Tucson or some homicide in Chicago. The Chicago police department contacted the Pima County Sheriff's office and Sullivan returned to Tucson where he was taken directly to Kino Community Hospital. He was committed to a psychiatric ward, treated and released and later received a 100% psychiatric disability pension. With the exception of the shooting of the University of Arizona employee, none of this information was known to defense counsel at the time of trial.

Defense counsel sought access to Detective Sullivan's psychiatric record to investigate his mental condition. Because Sullivan died between the 1984 trial and the 1986 post-conviction proceeding, the trial judge refused to release Sullivan's medical records unless a representative of his estate waived the physician-patient privilege. The judge did, however, give the records to Dr. Jose Santiago, a board certified psychiatrist and Chief of Psychiatry at Kino Community Hospital. Dr. Santiago reviewed them, resealed them, and later testified as to Sullivan's mental state.

Dr. Santiago testified that Sullivan had been diagnosed for purposes of his disability pension as a schizophrenic in partial remission. He further testified that schizophrenia does not impair a person's memory, although it could impair a person's ability to perceive data. He also testified that nothing in the records indicated that Sullivan had been unable to perceive properly. Other evidence in Sullivan's file indicated that his memory was intact.

A former homicide detective from the Tucson Police Department, John Martin,

testified that Detective Sullivan had harassed a potential witness, Francois Mayfield, in a 1975 murder case. Mayfield was murdered in 1975 and, according to Martin, Sullivan became a suspect in Mayfield's murder but was never charged.

The court allowed defendant to submit the questions he would have asked Sullivan at the trial had he possessed the information. The state replied with its probable objection. The trial court denied relief, finding "more smoke than fire," and holding that the material was collateral, inadmissible, and more prejudicial than probative. The court's minute entry of 9 September 1987, stated in pertinent part:

> The court finds that no information was disclosed to defense counsel concerning Detective Sullivan's mental state, i.e., that he was on 100 percent mental disability payments from the police retirement system since the latter part of 1977, nor was any information given to defense counsel about Detective Sullivan's hospitalization for mental illness, suicide attempts, or his diagnosis as a paranoid schizophrenic. However, defense counsel was aware that Detective Sullivan had killed a person in the line of duty while in the sheriffs department prior to his testimony in this case.

After a motion for rehearing was denied, a petition for review to this court was filed and we consolidated it with the direct appeal.[1]

## IV. DISCUSSION

### A. *Coercion of the State's Witness*

John Lesson, a state witness, testified inconsistently before two grand juries. On 24 February 1978, Lesson testified that he knew nothing about the Malloy killing and that defendant never told him that he had shot the victim. Upon leaving the grand jury room, he was arrested as an accessory to the murder. In March 1978, Lesson testified that defendant, when drunk, had told him that he killed a man because the

other man had shot at defendant first: "I can't remember the exact words, but I believe he said that this guy had shot at him and he shot back emptying two guns." Lesson further testified at the second grand jury that he knew the victim owed defendant $3,000 to $6,000, and that the police had told him about marijuana deals.

Lesson initially refused to testify at the trial on fifth amendment grounds because, among other reasons, he had given inconsistent statements under oath before two grand juries which could subject him to prosecution for perjury. At a hearing outside the presence of the jury, the following transpired:

THE COURT: What that comes down to, you're not protected by use immunity if you perjure yourself this morning or this afternoon in this trial. Nobody can give you that kind of immunity nor could you validly claim the Fifth Amendment.

THE WITNESS: Well, I feel at this point that's where the prosecution is headed, to charge me with perjury. I guess I'll take the lesser of the two evils and take the Fifth unless the prosecution can come up with something else.

THE COURT: I don't believe the State is going to be able to allow you to lie under oath at this trial and commit perjury at your whim and not prosecute you for it. Among other things the Court wouldn't stand for it.

THE WITNESS: I'm not suggesting that at all. I'm suggesting that I'm going to tell the truth. I never said anything about lying.

THE COURT: If you tell the truth, then I would expect that that would be a defense to the charge of perjury.

MR. PEASLEY: [for the state] It absolutely would, judge.

I would inquire at this point if Mr. Lesson intends to answer the questions that Mr. Tiers and I ask about his knowledge and information about Bruce Menard and his involvement in the death of

---

1. We note that this case is more than 12 years old. The delay from crime to trial (September 1976 to August 1984) appears to be the result of

the failure to locate defendant until 1983 when he was arrested.

Frank Malloy, and I would pose the question to the witness?

THE WITNESS: Are you asking me if I'm going to tell the truth?

THE COURT: Yes.

MR. PEASLEY: Yes.

THE WITNESS: If I'm not going to get charged with perjury, yes, I'll tell the truth.

MR. PEASLEY: I can assure the Court if Mr. Lesson tells the truth, he won't be charged with perjury.

THE COURT: What's your decision, Mr. Lesson.

THE WITNESS: If I'm not going to be charged with perjury I have nothing to lose. I'll answer the questions.

\* \* \* \* \* \*

Defendant argues that his right to due process was violated because the prosecutor and the judge improperly emphasized potential perjury charges when speaking with witness John Lesson, and thereby coerced Lesson to testify in conformity with his second grand jury testimony, or face prosecution for perjury or criminal contempt.

Defendant cites *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) as controlling. The trial court judge in *Webb* admonished the defendant's sole witness, as follows:

> Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the likelihood [sic] is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thor-

oughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.

*Webb,* 409 U.S. at 97, 93 S.Ct. at 352, 34 L.Ed.2d at 331. The Supreme Court reversed the defendant's conviction and held that the defendant was denied due process because the trial judge gratuitously and unnecessarily singled out this sole defense witness for a lengthy admonition on the dangers of perjury, thus, effectively driving defendant's witness off the stand. *Id.* The court stated:

> The right to offer the testimony of witnesses, and to compel their attendance if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Id.* (quoting *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)).

We believe that *Webb* is distinguishable from the instant case for two reasons.

■ First, cases requiring reversal when the state intimidates a witness usually arise where the defendant was completely deprived of the defense witness's testimony. *United States v. Hammond,* 598 F.2d 1008 (5th Cir.1979) (harmful error where government agent intimidated defense witness by out of court statements resulting in witness refusing to testify); *United States v. Morrison,* 535 F.2d 223 (3rd Cir. 1976) (prosecutor's repeated warnings culminating in a highly intimidating personal interview were completely unnecessary and infringed on defendant's constitutional

right to have witness's testimony); *United States v. Thomas*, 488 F.2d 334 (6th Cir. 1973) (witness was intimidated where government agent unnecessarily approached the defense witness and went to considerable lengths to advise the witness via out of court communications); *United States v. Smith*, 478 F.2d 976 (D.C.Cir. 1973) (conviction reversed where defendant's witness threatened with criminal prosecution if he testified). Another key factor in finding governmental coercion is whether the defendant is able to present "free and open testimony anticipated of a voluntary witness" versus "the perhaps guarded testimony of a reluctant witness who's willing to appear at the command of the court." *Thomas*, 488 F.2d at 336.

In the instant case, defendant was not deprived of his right to present witnesses. John Lesson was the state's witness and defendant was able to impeach Lesson on his prior inconsistent statements to the grand jury.

■ Second, there is no *per se* violation of a defendant's right to present witnesses when a trial court judge or prosecuting attorney advise prospective witnesses of the penalties for testifying falsely. *United States v. Hooks*, 848 F.2d 785, 799 (7th Cir.1988). An admonition merely laying out accurately the consequences of testifying falsely is not coercive or threatening. *Griffin v. Weinberger*, 492 F.2d 969, 970 (5th Cir.1974). *See also United States v. Risken*, 788 F.2d 1361 (8th Cir.1986), *cert. denied*, 479 U.S. 923, 107 S.Ct. 329, 93 L.Ed.2d 302 (1986) (no unconstitutional prejudice to defendant where prosecutor told witness about serious consequences of perjury); *United States v. Gloria*, 494 F.2d 477 (5th Cir.1974), *cert. denied*, 419 U.S. 995, 95 S.Ct. 306, 42 L.Ed.2d 267 (1974) (held proper to advise of possibility of prosecution if testimony materially differed from his prior plea, not that witness would be prosecuted if he testified).

■ Here, both the judge and prosecutor simply advised Lesson that he would face penalties only if he perjured himself on the stand. They did not threaten him in any way nor did they refer to his prior incon-sistent statements before the grand juries. We hold that defendant was not deprived of any rights as the state's witness was available for cross-examination and the witness was merely advised of the consequences of perjury by both the judge and the prosecutor.

### B. *Prosecutorial Misconduct*

■ Defendant alleges that the prosecutor engaged in several instances of misconduct which denied defendant his right to a fair trial. Misconduct of counsel alone will not cause a reversal, unless the defendant has been denied a fair trial as a result of the actions of counsel. *State v. Hallman*, 137 Ariz. 31, 37, 668 P.2d 874, 880 (1983). We address each area of alleged misconduct separately.

### 1. "Purchased" Testimony

Defendant argues that the prosecutor violated the code of ethics and A.R.S. § 13–2802 (influencing a witness) by offering McCloud an attractive plea bargain in exchange for his testimony at trial regarding defendant's jailhouse confession. The defendant argues that this plea bargain, in effect, "purchased" McCloud's testimony. We do not agree.

The code of ethics provides that a lawyer shall not "falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law." 17A A.R.S.Sup.Ct.Rules, Rules of Professional Conduct, Rule 42, ER 3.4(b). A person commits a felony if he "threatens a witness or offers, confers or agrees to confer any benefit upon a witness" with intent to "influence the testimony of that person." A.R.S. § 13–2802.

No evidence exists in the record that the prosecutor illegally influenced the witness or that he induced the witness to testify falsely. The prosecutor, in his discretion, merely offered a favorable plea agreement to the witness.

The District of Columbia Court of Appeals in *Price v. United States*, 531 A.2d 984, 987 (D.C.1987), faced an issue similar to the one in the instant case. The defen-

dant in *Price* attacked the plea agreement as being so favorable to his accomplice that it denied the defendant a fair trial. The government had agreed to dismiss the charges of first degree murder while armed, first degree felony murder while armed, attempted robbery while armed and carrying a pistol without a license in exchange for the accomplice's truthful testimony at trial and a plea of guilty to attempted robbery. The court held that the plea agreement did not violate the defendant's rights. *Id.* at 988. The court charged the factfinder with the task of assessing credibility and stated:

> We remain convinced that the factfinder must determine the credibility of witnesses and, in the process, be allowed information as to any plea agreements between those witnesses and the government. The jury, not a reviewing court, is the one to decide whether a particular plea arrangement has caused a witness to give falsely incriminating testimony.

*Id.*

Here, the jury could assess the credibility of McCloud's testimony because his plea arrangement was offered into evidence by both the state and the defendant. We hold that no prosecutorial misconduct occurs where the prosecutor merely arranges a favorable plea agreement with one of the several witnesses testifying against the defendant and that the defendant is not denied a fair trial where the jury is able to assess the credibility of that testimony.

### 2. Personal Opinion By Prosecutor

Defendant argues that during the closing argument the prosecutor expressed his personal opinion about defendant's guilt and repeatedly bolstered his personal integrity before the jury. Defendant cites the following as an example:

> I submit to you I have been in the County Attorney's Office since January of 1978 and I have no intention of going elsewhere. Since January of 1978 I have been prosecuting cases ... and I have learned one lesson ... if you're going to prosecute people like Bruce Dumaine you

necessarily have to deal with the people the likes of John Lesson and Mark McCloud and people like Toni Noble and Sharon Mingelli. Good citizens don't call up and say, I have this information ...

The defendant maintains that impermissible prosecutorial vouching took place because the prosecutor placed his personal opinion before the jury and used the weight and prestige of the County Attorney's Office to further bolster his statements.

Two forms of impermissible prosecutorial vouching exist: (1) when the prosecutor places the prestige of the government behind its witness, and (2) where the prosecutor suggests that information not presented to the jury supports the witness's testimony. *State v. Vincent,* 159 Ariz. 418, 423, 768 P.2d 150, 155 (1989). In addition, a lawyer is prohibited from asserting personal knowledge of facts in issue before the tribunal unless he testifies as a witness. *State v. Salcido,* 140 Ariz. 342, 344, 681 P.2d 925, 927 (1984). Wide latitude, however, is given in closing arguments, and counsel may comment on evidence and argue all reasonable inferences therefrom. *State v. McDaniel,* 136 Ariz. 188, 197, 665 P.2d 70, 79 (1983). The test for reversible error is whether the prosecutor's closing argument brought to the attention of the jurors matters they could not properly consider. *State v. Snowden,* 138 Ariz. 402, 406, 675 P.2d 289, 293 (1983).

Although the prosecutor's boastful comments as to his time of service with the County Attorney's Office were irrelevant and unnecessary under the circumstances, we find that they did not deny the defendant a fair trial. First, the prosecutor did not vouch for the credibility or the truthfulness of the state's witnesses. He did not imply that the witnesses were credible just because the state had called them to testify. On the contrary, he implied that the witnesses were not what one might call "good citizens."

Second, the prosecutor did not call attention to matters which were improper for the jury's consideration. Rather, he was attempting to play down the impact of the

**402**

state's witnesses who were "the likes of" persons who were not "good citizens." "In order to constitute a direct violation of the fourteenth amendment, the prosecutor's comment must have been misconduct so egregious that it deprived the defendant of a fair trial, thus making the resulting conviction a denial of due process." *United States ex rel. Shaw v. De Robertis,* 755 F.2d 1279, 1281 (7th Cir.1985). We hold that the prosecutor's remarks in this case regarding his career longevity did not deny the defendant a fair trial.

### 3. Matters Not In Evidence

During closing argument, the prosecutor stated:

> Now, there are some things that I cannot tell you about this case. I want to talk to you about those. I cannot tell you precisely what happened between the OK Corral and the gravesite where Frank Malloy's body was found. There are only two or possibly more people who could have told you that. One is the assailant, and he is sitting at the defense table right now.

■ Defendant contends the prosecutor's statements referred to evidence not in the record, thus implying that more evidence existed. Wide latitude is given in closing argument, and counsel may comment on and argue all justifiable inferences which can reasonably be drawn from the evidence adduced at trial. *State v. Woods,* 141 Ariz. 446, 454, 687 P.2d 1201, 1209 (1984). The arguments must be based on facts the jury is entitled to find from the evidence and not on extraneous matters that were not or could not be received in evidence. *State v. Neil,* 102 Ariz. 299, 300, 428 P.2d 676, 677 (1967).

■ The prosecutor's comment that "there are some things that I cannot tell you" was not a comment on extraneous matters not admitted in evidence. He merely illustrated the logical inference that at the scene of the crime there were only two persons who could give the complete story: the victim and the defendant. The prosecutor did not bring in new evidence nor did he refer to any inadmissible evi-

dence for the jury to consider. Neither do we find the remarks by the prosecutor a comment on the defendant's failure to testify since the defendant did in fact take the stand and testify in his own behalf. Under the facts of this case, we hold that the prosecutor did not refer to matters not admitted into evidence.

### 4. Prosecution's Alleged Attack on Defense Counsel's Ethics

The defendant next objects to the prosecutor's alleged attack of defense counsel's ethics. During defense counsel's closing argument, the following occurred:

> MR. TIERS [for the defense]: I think, and I think what the evidence from the witness stand should show you, is that once Detective Sullivan convinced Toni Noble that Bruce did it, everything that came up about Bruce for Toni Noble was seen in the context of this killing.
>
> Why at that point does detective Sullivan go to Toni Noble and tell her that Bruce did it? Where is the evidence? What did Sullivan have at that point? Is there something that Mr. Peasley [attorney for the state] has got that he hasn't shown you?
>
> MR. PEASLEY [for the prosecution]: I am going to object. He knows darned well that isn't true.
>
> THE COURT: Sustained.
>
> MR. PEASLEY: May I approach the bench. That's a—
>
> THE COURT: Not at this time, Mr. Peasley. You may continue, Mr. Tiers.
>
> MR. TIERS: There has been no evidence presented to you that Detective Sullivan knew anything. And the evidence—
>
> MR. PEASLEY: Same objection, Judge.
>
> THE COURT: Overruled.

 \* \* \* \* \* \*

Defendant argues that the prosecutor's statement "he knows darn well that isn't true," attacked defense counsel's integrity and indicated that defense counsel was deceiving the jury. Thus, defendant asserts that the prosecutor's objection tainted defendant's right to due process and requires reversal of his conviction.

The trial court is in the best position to determine whether the attorney's remarks require a mistrial, and its decision will not be disturbed absent plain abuse of discretion. *State v. Hansen*, 156 Ariz. 291, 296–97, 751 P.2d 951, 956–57 (1988). "In determining whether remarks made by counsel in a criminal case are so objectionable as to warrant a new trial, the trial court should consider: (1) whether the remarks call to the attention of the jurors matters that they would not be justified in considering in determining their verdict, and (2) the probability that the jurors, under the circumstances of the particular case, were influenced by the remarks." *Id.*

The defendant raised this matter in his motion for new trial and the trial court found that the remark by the prosecutor did not influence the verdict. We hold that the prosecutor's comment in response to defense counsel's closing comment was not so egregious as to deny the defendant a fair trial because it did not bring improper matters to the attention of the jury nor was it probable that it influenced their verdict in light of all the evidence.

5. Supervisory Powers

Finally, defendant requests that because of the errors committed by the prosecutor, this court apply the supervisory powers doctrine to remedy the alleged widespread misconduct by the prosecution. The supervisory powers doctrine enables a court to, within limits, formulate procedural rules not specifically required by the state or federal constitutions or the legislature. Courts should exercise this inherent power to accomplish several goals including remedying violations of recognized rights. *See United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96, 100 (1983).

We will not, however, exercise our supervisory power to control improper prosecutorial conduct unless there has been an error so serious as to prejudice the defendant's right to a fair trial. *See State v. Valdez*, 160 Ariz. 9, 770 P.2d 313 (1989). Nor will we use the supervisory power to reverse a conviction "when the error to which it is addressed is harmless since, by definition, the conviction would have been obtained despite the asserted error." *Hasting*, 103 S.Ct. at 1979. The only error we find concerns the prosecutor's alleged misconduct in his statement of his personal opinion in closing argument and we hold this to be harmless error. In addition, this is not a case where the prosecutor's pervasive misconduct has caused the accused to have an unfair trial which would require our application of supervisory powers. *Valdez, supra. Compare State v. Moore*, 108 Ariz. 215, 495 P.2d 445 (1972) (defendant denied fair trial by interposing of over 850 objections plus over 200 other interruptions by the prosecutor during defendant's cross-examination); *with State v. Denny*, 119 Ariz. 131, 579 P.2d 1101 (1978) (prosecutor's interruptions and objections during closing argument did not result in an unfair trial under the circumstances).

C. *Jury Instructions*

1. Manslaughter

The trial court charged the jury as to both first and second degree murder, but gave no instruction relating to the crime of manslaughter, nor was any requested by the defendant. Defendant argues that it was fundamental error for the trial court to fail to instruct on the lesser degree of homicide.

When supported by the evidence, instructions for second-degree murder, manslaughter, or negligent homicide are required in first degree murder trials and failure to instruct the jury is fundamental error. *State v. Lamb*, 142 Ariz. 463, 472, 690 P.2d 764, 773 (1984). This is so even when the defendant does not request the instruction. *State v. Vickers*, 129 Ariz. 506, 513, 633 P.2d 315, 322 (1981).

There was, however, no evidence to support a manslaughter instruction in this case. A lesser included offense instruction should not be given when the evidence is such that the defendant is guilty only of the crime charged or not guilty at all. *Lamb*, 142 Ariz. at 472, 690 P.2d at 773. *See also State v. Noleen*, 142

Ariz. 101, 688 P.2d 993 (1984) (where evidence produced by the state tended to show premeditation and defendant's testimony showed accidental killing no instruction on lesser included offense required); *State v. Hickson,* 104 Ariz. 218, 450 P.2d 408 (1969) (involuntary manslaughter instruction inappropriate where defendant intentionally pulled gun and fired).

The facts in *Lamb* are similar to the facts in the instant case. In *Lamb,* the defendant was charged with first degree murder and he defended with an alibi. The state used the testimony of two witnesses who heard the defendant comment on a "murder" and the defendant was convicted. We held that the evidence did not indicate second-degree murder, manslaughter or negligent homicide. Since the defendant denied that he was the one who committed the crime, based on the evidence, he could only have been found guilty of first degree murder or not guilty of anything. *Lamb,* 142 Ariz. at 472, 690 P.2d at 773.

 In the instant case, defendant was charged with first and second degree murder. His alibi was that he was moving furniture with his brother at the time of the murder. The state furnished testimony from four witnesses who heard the defendant make remarks regarding a killing in which he shot someone. The defendant denied ever making these comments and admitted that at times (i.e., during the seance with two of the witnesses) he was just "playing along" by discussing a killing. There was no evidence that the victim's death was caused by recklessness, a heat of passion resulting from adequate provocation, an aided suicide, or a coerced second degree murder (A.R.S. § 13–1103). Thus, the defendant was guilty of either first or second degree murder or nothing at all.

We hold that the evidence does not support a manslaughter instruction.

## 2. Self–Defense and Defense of Third Person Instruction

Defendant contends that the trial court erred by failing to instruct the jury on self-defense or defense of a third person, although the defendant did not request such an instruction.

 By statute, a person is justified in threatening or using physical force against another person when and to the extent a reasonable person would believe that physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful physical force.

A.R.S. § 13–404(A). Similarly, a person may use deadly physical force against another to protect a third person if that person would have been justified under 13–404 (self-defense). A.R.S. § 13–406. When determining whether a self-defense instruction is required, we look to defendant's evidence and to any other evidence that might support a claim of self-defense. *State v. Noriega,* 142 Ariz. 474, 482, 690 P.2d 775, 783 (1984). Even the slightest evidence of self-defense mandates an instruction on the issue. *Id.*

 We have defined "slightest evidence" as that "tending to prove a hostile demonstration, which may reasonably be regarded as placing the accused apparently in imminent danger of losing her life or sustaining great bodily harm." *State v. Lujan,* 136 Ariz. 102, 104, 664 P.2d 646, 648 (1983). This "hostile demonstration" must be some overt act which the defendant perceives as immediately life threatening. *Id.* The court must refuse to instruct on self-defense where the evidence is insufficient to raise a reasonable doubt as to whether a defendant accused of a homicide did act in self-defense. *Walker v. State,* 52 Ariz. 480, 481, 83 P.2d 994, 995 (1938).

 In Arizona, a self-defense instruction will be given only if the defendant can demonstrate the following three elements: (1) he reasonably believed he was in immediate physical danger; (2) he acted solely because of this belief; and (3) he used no more force than appeared reasonably necessary under the circumstance. *State v. Walters,* 155 Ariz. 548, 553, 748 P.2d 777, 782 (1987).

■ Defendant points to Noble and Lesson's testimony offered by the state as evidence supporting a self-defense instruction. Noble testified that defendant stated he started shooting the victim because "the person involved also had a weapon," and "he had thought that someone with him had been injured and that's why he started to shoot." John Lesson testified that defendant had told him that "this guy" shot at him and he shot back emptying two guns. Dr. Edward Brucker, a pathologist, testified that 4–5 bullet wounds were inflicted on the victim from behind while the victim was on the ground, or from above, as in a tree. We believe this is insufficient evidence to support a self-defense or defense of a third person instruction.

Defendant argues that pleading an inconsistent defense is proper in light of the United States Supreme Court's decision in *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). The court in *Mathews* held that even if the defendant denies one or more of the elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment. *Mathews*, 485 U.S. at 61, 108 S.Ct. at 886, 99 L.Ed.2d at 57. We find that defendant's reliance on *Mathews* is misplaced because the court held that there must be sufficient evidence of entrapment to justify an entrapment instruction. Here, we find insufficient evidence with regard to the elements of self-defense and defense of a third person.

We note also that defendant not only denied the killing but failed to request a self-defense instruction or defense of a third person. *See State v. Blankenship*, 99 Ariz. 60, 68, 406 P.2d 729, 737 (1965); *Judd v. State*, 41 Ariz. 176, 193, 16 P.2d 720, 726 (1932).

We find no error.

## D. *Post Conviction Relief*

Consolidated with defendant's appeal of his conviction and sentence is a review of the trial court's denial of defendant's petition for post-conviction relief pursuant to Rule 32, Ariz. Rules of Crim.Proc., 17 A.R.S.

Defendant claims the trial court erred in: (1) failing to grant a new trial because of the prosecution's non-disclosure of Detective Sullivan's mental condition; and (2) depriving defendant of access to Sullivan's medical records.

### 1. Failure to Disclose

Defendant alleges that prosecutorial non-disclosure of evidence of Sullivan's mental condition was error and warrants a new trial. Such nondisclosure raises the rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), codified in 17 A.R.S. Rules of Crim.Proc., Rule 15.1.

■ In *Brady*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218. Due process is violated when the prosecution suppresses evidence that favors the defendant and would affect the jury's determination. *State v. Jessen*, 130 Ariz. 1, 4, 633 P.2d 410, 413 (1981). The test for a *Brady* violation is whether the undisclosed material would have created a reasonable doubt had it been presented to the jury. *Id.*

■ Rule 15.1(a)(7) requires the state to disclose a wide range of material including "[a]ll material or information which tends to mitigate or negate the defendant's guilt as to the offense charged." In Arizona, the disclosure of favorable evidence is required whether or not the defendant requests it. *State v. Jones*, 120 Ariz. 556, 560, 587 P.2d 742, 746 (1978). Failure to disclose such information may result in various sanctions such as a mistrial. *Id.*

■ A defendant may obtain a new trial if the evidence which the prosecutor failed to disclose is material. *State v. Schreiber*, 115 Ariz. 555, 558, 566 P.2d 1031, 1039 (1977); *State v. Wilder*, 22 Ariz. App. 541, 542–43, 529 P.2d 253, 254–55

(1974), *cert. denied,* 423 U.S. 843, 96 S.Ct. 78, 46 L.Ed.2d 64 (1975). Materiality is defined as either evidence that might lead the jury to entertain a reasonable doubt about the defendant's guilt or nondisclosure of evidence that may prejudice the defense. *Id.* 22 Ariz.App. at 543, 529 P.2d at 255. In addition, such undisclosed evidence must have been admissible at trial. *Id.*

 Defendant argues that the prosecution's nondisclosure of Detective Sullivan's mental condition denied him a fair trial. Presumably, defendant would have used evidence of Sullivan's mental condition for impeaching his credibility as a witness. The use of a witness's mental condition for impeachment purposes is proper if there is an indication that the mental condition affected the truth of his testimony. *State v. Zuck,* 134 Ariz. 509, 513, 658 P.2d 162, 166 (1982). In *Zuck* we stated:

> The existence of a derangement of the sort termed insanity is admissible to discredit, provided that it affected the witness at the time of the affair testified to or while on the stand or in the meantime so as to cripple his powers of recollection (citation omitted). Many psychiatric problems do not affect a witness's credibility or capacity to observe and communicate.

*Id.* at 513, 658 P.2d at 166. Before the psychiatric history of a witness is admissible for impeachment purposes, the proponent must show how it affected the witness's ability to observe and relate the matters to which he testifies. *Id.*

 Based upon the testimony presented at the defendant's Rule 32 evidentiary hearing, the trial court ruled as follows:

> [T]here is unequivocal evidence that Detective Sullivan's mental illness DID NOT adversely affect his ability to perceive, recall or accurately relate the events that occurred during his investigation of the instant crime or at the time of trial. [T]he Court concludes that, had this additional information been known to the defendant and his counsel, that the result of the trial would not have been different beyond a reasonable doubt.

The trial court judge found that there was insufficient evidence that Detective Sullivan's emotional problems affected his capacity to observe and communicate. We agree. Neither was it shown that Sullivan's condition affected his memory.

 Finally, defendant argues that regardless of the finding by the trial court, the prosecutor knowingly withheld evidence from the defendant and thus committed pervasive prosecutorial misconduct. The decision whether to impose sanctions and the choice of sanctions for a violation of disclosure is within the sound discretion of the trial court. *State v. Stewart,* 139 Ariz. 50, 59, 676 P.2d 1108, 1117 (1984). Absent a showing of prejudice, the trial court's decision will not be reversed on appeal. *Id.* We find that the trial court did not err with respect to the nondisclosure of these non-material records.

### 2. Access to Records

The defendant argues that Detective Sullivan's medical records should have been made available to him even though Sullivan was dead at the time of trial. The physician-patient privilege as well as the psychologist-patient privilege, is recognized in Arizona in A.R.S. §§ 13–4062(4), and 32–2085. *State v. Stotts,* 144 Ariz. 72, 86, 695 P.2d 1110, 1124 (1985); *State v. Santeyan,* 136 Ariz. 108, 110, 664 P.2d 652, 654 (1983). The general rule is that the physician-patient privilege belongs to the patient and it is preserved even after the patient's death. *Bassil v. Ford Motor Co.,* 278 Mich. 173, 270 N.W.2d 258, 260 (1936) (privileged matter disclosed to physician held protected after patient's death). *See* 8 Wigmore, *Evidence* § 2386–7 (McNaughton Rev.1961); *McCormick on Evidence,* E. Cleary, § 102 (3rd ed. 1984); 97 A.L.R.2d 397 (1964).

We need not, however, reach the question of the survivability of the privilege in Arizona. Based upon our review of the testimony during the Rule 32 proceeding, we find that the defendant was not prejudiced by the withholding of evidence of

Detective Sullivan's mental condition. We find no error.

## V. CONCLUSION

We have researched the record for fundamental error according to the mandate of A.R.S. § 13–4035 and *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and have found none.

Affirmed.

GORDON, C.J., FELDMAN, V.C.J., MOELLER, J., and LAWRENCE HOWARD, Court of Appeals Judge, concur.

HOLOHAN, J., retired prior to the filing of this opinion. Pursuant to Ariz. Const. Art. 6, § 3, LAWRENCE HOWARD, Judge, Court of Appeals, Division Two, was assigned to sit in his stead.